## YOUNG *v.* LYNCH
[No. 38, October Term, 1949.]

*Decided December 8, 1949.*

Before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

Submitted on brief by *Hamilton P. Fox, Jr.*, and *Clark & Hearne* for the appellant.

Submitted on brief by *Harvey & Cropper* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by defendant from an order overruling a motion to strike out a judgment for plaintiff. The case, removed from Wicomico County, is a suit for damages for assault and battery. On October 21, 1948 the jury was sworn, the case tried, and a verdict for $4,000 rendered. On November 19th defendant's motion for a new trial was granted unless plaintiff should file a remittitur of $500. On November 22d the remittitur was filed and judgment entered for $3,500. On December 20th an order for appeal was filed, and on January 25, 1949 an order to dismiss the appeal. On December 31, 1948 defendant filed a motion to strike out the judgment on the ground that the jury was illegally constituted. On March 15th the motion was overruled.

Lawrence R. Parsons and Luther G. Parsons are brothers. Lawrence is 54 and has dark hair; Luther is 61 and has white hair. Both live in the same election district of Worcester County. Both were qualified to serve as jurors and were on the list of two hundred names from which forty-eight jurors were drawn for the October, 1948 term. Code, Public Local Laws, Art. 24, secs. 86-91. Lawrence's name was drawn, Luther's was not.

A deputy sheriff, who has known both "for some twenty years", was given a summons for Lawrence but summoned Luther. He says he addressed Luther as "Lawrence", Luther says as "Mr. Parsons". Later the sheriff also saw Luther and summoned him. In response to the summons Luther attended court, served as a juror in several cases, including the instant case, answered when Lawrence's name was called, and signed and collected a check in Lawrence's name for jury service. The

clerk of the court, who has known both Lawrence and Luther about five years, was present at the drawings of the jury and at the trial of the instant case. To the best of his recollection Luther's name was mentioned and his occupation discussed when Lawrence's name was drawn. His "theory" as to why he "didn't notice the difference between the two men in court" is that he "is busy up here with work", and does not "pay too much attention to these gentlemen out here. I know them both. I have known them for quite some time. It is just like you fellows have seen two brothers. When you meet them on the street you probably call one by one name which would be the name of the other brother. It doesn't register in your mind. It didn't register in my mind until after this court was over. When it was over and it came to my mind I said immediately I knew we were wrong; the wrong man had been here. That is the best explanation I can give for it. I think it would happen to anyone of you gentlemen."

Luther had served on the grand jury once; he had never been on a petit jury before. He says he "didn't know that it was so strict when you drew anyone out of the box to serve on the jury. And our names get mixed so much. Mr. Small [the deputy] knows me. And he knows Lawrence. But two brothers, they get them mixed. Mr. Small really believed I was supposed to be summoned on the jury. I think he thought so. I know a lot of people meets me on the street in Pocomoke City—Mr. Jimmie Tilghman, he meets me on the street and he will call me Lawrence every time. And I go in there and deal with him. It was just one of those things got mixed up. I didn't know it was so serious when they called Lawrence Parsons' name and I answered". He did not know either plaintiff or defendant.

Mr. Kerbin, local counsel for defendant, knows both Lawrence and Luther and has known them (or Luther) ten or twelve years. He participated in the selection of the jury. When he got the jury list he made his investigation as to Lawrence, as to whether he wanted

Lawrence to serve on the jury or not. Usually he checks to find out if they know anything about the plaintiff, and whether they are interested in the case. If they are disinterested, you take them. He satisfied himself. When the jury was drawn he "glanced at the jury". He was interested in names. He did not "pay any attention who was going in the panel because of the fact [he] knew from the list." He gets the brothers mixed up. "You know people, but a lot of times you get them mixed up." There is no evidence that before the verdict Mr. Kerbin or defendant had or would have had any objection or reason for objection to Luther serving on the jury.

Defendant, in his motion and in his brief, refers to Luther as an "impostor", "impersonator", and "forger", who "deliberately misrepresented his identity with dishonest intentions and designs." Of course, in drawing jurors or selecting a jury, brothers ought not to be treated like fungible goods. But in view of the apparent attitude of the sheriff, his deputy, the clerk—and defendant's counsel—Luther's self-effacing acquiescence does not justify the epithets defendant now hurls at him. Defendant's counsel says the fact that Luther served on the jury was first brought to his attention on December 23, 1948. If the fact had been of any consequence to defendant, it could have been learned by looking at the jury before they were sworn. The evidence shows that the mistakes occurred without fraud or dishonesty on the part of the juror or any one else, without injury to defendant, and without effort on defendant's part to prevent or correct them.

"At common law, jurors were selected by the sheriff in his discretion. *Bacon's Abridgement,* 'Juries' B. B.; 12 *Enc. Pl.* and *Pr.* 273.; *Thompson and Merriam on Juries,* § 44. In this state the sheriff always made the selection of the panel after the common law method, until the act of 1867, ch. 329 [Code of 1939, Art. 51, secs. 6-12]. *Cooper v. State,* 64 Md. [40] 45, 20 A. 986. But this large discretion produced such abuses that the practice has been changed by statutes in most of the United

States * * *." *State v. McNay,* 100 Md. 622, 626, 60 A. 273, 274. For present purposes, the Worcester County jury law is substantially similar to the general law, (Act of 1867; Art. 51; *Hollars v. State,* 125 Md. 367, 93 A. 970) and various local laws which have been construed and applied by this court, *e.g.,* Prince George's County, (*State v. McNay, supra,*) St. Mary's County, (*King v. State,* 190 Md. 361, 58 A. 2d 663), and also to the Act of Congress of 1879, 21 Stat. 43. *United States v. Ambrose,* 3 Fed. 283, opinion by Mr. Justice Swayne at circuit, *infra.* In *State v. Glascow,* 59 Md. 209, 212, the court, referring to the Baltimore County jury law, said: "The statute is to be regarded mainly as directory in its multifarious provisions; and unless any irregularity incident to carrying out its directions in good faith shall be shown to materially violate it, or so affect the juries as to prejudice the rights of the citizen, these irregularities should not be treated as fatal." (Quoted in *King v. State, supra,* 190 Md. 361, 58 A. 2d 666, and in part in *Hollars v. State, supra,* 125 Md. at page 376, 93 A. 970.)

"Numerous authorities from other states were cited in the argument. * * * With regard to all these cases it may well be said, as said by Judge Pearce in *State v. McNay,* 100 Md. 622, 60 A. 273: 'It is obvious that general expressions upon this subject taken from any particular case, must be considered with reference to what was in each case considered and decided. Whether a particular provision of a statute is to be held mandatory or directory does not necessarily depend merely * * * upon the language in which it is declared, but in large measure upon the character and purpose of the provision, and the legislative intent to be deduced from a proper consideration of the means provided for its certain operation, and the consequences which would follow from one or the other construction. Positive commands and positive prohibitions have alike been held directory.'

"With regard to the provisions of a local law requiring that the jurors should be able to read and write, the opinion says: 'The consequence of holding this provision

mandatory would be far-reaching and most disturbing. The probable frequency of mistakes in this respect would jeopardize the validity of indictments and the affirmance of this judgment would offer strong inducements for collusion between criminals and the venal jurors who, in spite of every precaution, are sometimes impaneled. It was undoubtedly such considerations as these which caused the United States Circuit Court for the Southern District of Ohio to hold in *United States v. Ambrose,* 3 Fed. 283, that where a grand jury was drawn under the act of Congress of 1879 and the name of one of the jurors who had assisted in finding the indictment was not put into the box or drawn from it by any competent authority, and there was no imputation that such name appeared in the venire through bad faith, this was an irregularity only which would not vitiate the action of the Grand Jury.' " *Hollars v. State, supra,* 125 Md. at page 377, 93 A. at page 974.

In *United States v. Ambrose, supra,* 3 Fed. at page 287, Mr. Justice Swayne remarked that he regarded a defect in the organization of a petit jury and a grand jury in a very different light. In the instant case, in the absence of any fraud or injury, we see no difference in this respect. This court has held that a judgment or verdict will not be set aside because a juror is over 70 (*Green v. State,* 59 Md. 123, 43 Am. Rep. 542) or under 25 (*Johns v. Hodges,* 60 Md. 215, 216, 45 Am. Rep. 722) or is a non-resident (*Hansel v. Collins,* 180 Md. 100, 23 A. 2d 1) if by making proper inquiry the complaining party might have learned of the juror's age or non-residence and challenged him. In *Hollars v. State, supra,* 125 Md. at pages 369-370, 93 A. at page 972, it was held that an indictment was not vitiated by the fact that an incorrect name was put in the box and drawn as a grand juror, when the misnomer was discovered and corrected and the man who was summoned and served was "the identical person intended by the court." Though a distinction has been made between such a case (*Wray v. Thorn,* (1744), Willes 438; *Case of a Juryman,* (1783),

12 East 251) and a case of a wrong person answering to a name on the panel (*Norman v. Beaumont,* (1744), Willes, 484; *Rex v. Tremearne,* (1826) 5 B. & C. 254; *contra, Hill v. Yates,* (1810), 12 East 229), we think the construction of Maryland jury statutes since 1867 leaves no room for such a distinction in the instant case. The object of these statutes is to obtain disinterested qualified jurors. Since a verdict is not vitiated by an initial error in putting in the box the name of a disqualified person, who is drawn and serves, it is not vitiated by an error at a later stage which results in selection of a juror who is disinterested and qualified though he is not the person intended at the initial stage.

In view of the facts in the instant case, there is no occasion to consider cases, in other jurisdictions, of "imposters" or "impersonators" who get on a jury by "deliberate misrepresentation" with "dishonest intentions and designs", (*Lee v. Baltimore Hotel Co.,* 345 Mo. 458, 136 S. W. 2d 695, 127 A. L. R. 711, and cases in note, 127 A. L. R. 717) or cases where objection is made before verdict. *Dovey v. Hobson,* (1815), 6 Taunt, 460; *Doe v. Michael,* (1851), 16 Q. B. 620.

*Order affirmed, with costs.*