924 A.2d 1072

**Marcus Dannon OWENS**

v.

**STATE of Maryland.**

**No. 103, Sept.Term, 2006.**

Court of Appeals of Maryland.

June 5, 2007.

394

Peter F. Rose, Asst. Public Defender (Nancy S. Forster, Public Defender, and Stacy W. McCormack, Asst. Public Defender, on brief), Baltimore, for Petitioner.

Mary Ann Ince, Asst. Atty. General (Douglas F. Gansler, Atty. General, on brief), Baltimore, for Respondent.

Argued Before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (Retired, specially assigned), JJ.

HARRELL, Judge.

Trial by jury is lauded as "the very palladium of free government," [1] and a "sacred bulwark of the nation." [2] Thomas Jefferson lauded "trial by jury as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." 3 WRITINGS OF THOMAS JEFFERSON 71 (Washington ed., 1861). Encroachment on this institution by the expanding jurisdiction of the English vice-admiralty courts, the trials of which were conducted without juries,[3] was chief among the complaints registered by American colonists in the Declaration of Independence.[4] There can be no

---

1. THE FEDERALIST No. 83, at 519 (Alexander Hamilton) (J. Gideon ed., 1818).

2. 4 WILLIAM BLACKSTONE, COMMENTARIES * 344 (1769) (referring to England, whose common law was applicable to the American colonies at the time of Blackstone's writing).

3. Daniel D. Blinka, *Jefferson and Juries: The Problem of Law, Reason, and Politics in the New Republic*, 47 AM. J. LEGAL HIST. 35, 79 (2005).

4. THE DECLARATION OF INDEPENDENCE para. 20 (U.S.1776) ("For depriving us in many cases, of the benefit of Trial by Jury."). By operation of the Sugar Act of 1764 and the Stamp Act of 1765, offenses under those statutes were to be tried by the vice-admiralty court located in Halifax, Nova Scotia, regardless of where the offense was committed, even if it had no maritime implications. Blinka, *supra* note 3, at 79; *see also* Thomas C. Grey, *Origins of the Unwritten Constitution: Fundamental Law in American Revolutionary Thought*, 30 STAN. L. REV. 843, 870 (1978). This compounded the abridgment of the right to a jury trial by removing the power to render judgment from the vicinage of where the

question that the jury trial is a vital and cherished institution of United States [5] and Maryland law.[6]

---

offense was committed. Sam Sparks & George Butts, *Disappearing Juries and Jury Verdicts*, 39 TEX. TECH L. REV. 289, 290–91 (2007); see also *infra* note 24 for more on the concept of vicinage. Further, the "Coercive" or "Intolerable" Acts of 1774 provided that some violations of its provisions had to be tried in England. LEONARD W. LEVY, ORIGINS OF THE BILL OF RIGHTS 226 (1999).

5. In addition to its mention as a grievance against the Crown in the Declaration of Independence, the preservation of the jury trial was discussed in several other foundational documents. The "Stamp Act Congress," so-called because its tenure coincided with the passage of the Act, declared in a petition to the King the colonies' "full power of legislation and trial by jury." John Dickinson, *A Petition to the King from the Stamp Act Congress, in* 1 THE POLITICAL WRITINGS OF JOHN DICKINSON 1764–1774, at 193–96 (Paul Leicester Ford ed., 1970) (1895). The First Continental Congress expressed in the fifth resolution of The Declaration of Rights of 1774 that "the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." 1 JOURNALS OF THE CONTINENTAL CONGRESS: 1774–1789, at 69 (Worthington C. Ford ed., 1904). The right to jury trial was also secured in The Northwest Ordinance of 1787. Northwest Ordinance of 1787, art. II, *reprinted in* 2 THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS 960–61 (Francis N. Thorpe ed., 1909). Further, every state constitution composed prior to 1787 guaranteed the right to a jury trial in criminal cases. LEONARD LEVY, *Bill of Rights, in* ESSAYS ON THE MAKING OF THE CONSTITUTION 258, 269 (Leonard Levy ed., 1987).

Since our nation's founding, the right to trial by jury has been defended vigorously. American jurisprudence on the right to jury trials is epic, beginning with the landmark case of *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 309, 25 L.Ed. 664 (1880), enforcing a black defendant's right to a jury not selected by discriminatory means intended to eliminate black jurors. The seminal decisions in *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89 (1994), restricting discriminatory abuses of peremptory challenges to remove blacks and women from criminal juries, respectively, represent the latest struggles to preserve this fundamental institution. In view of this history, the Supreme Court has opined that "the inestimable privilege of trial by jury ... is a vital principle, underlying the whole administration of criminal justice." *McCleskey v. Kemp*, 481 U.S. 279, 309, 107 S.Ct. 1756, 1776, 95 L.Ed.2d 262 (1987) (quoting *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 123, 18 L.Ed. 281 (1866)).

6. The first Constitutional Convention of Maryland referred to the same grievance of the abridgment of the right to a jury trial as articulated in

With that historical perspective firmly in mind, we confront the issues concerning this right debated by the parties in the present case. The primary controversy touches on the question of whether the empaneling of a non-citizen on a jury in a criminal case abridged Marcus Dannon Owens's right to a jury trial under either the U.S. or Maryland Constitutions. Alternatively, we consider whether empaneling a non-citizen juror violates "merely" Maryland statutory law. In either case, we decide whether Owens waived his opportunity to object to service by the non-citizen on his jury.

The second issue we review is whether Owens was "in custody," as that term is understood in Fifth Amendment jurisprudence, at the time he was questioned, without *Miranda* [7] warnings, by the police at the hospital where his stepson was taken following a medical emergency.

## I. FACTS

Marcus Dannon Owens was tried in the Circuit Court for Howard County before a presiding judge and a jury of twelve individuals, on charges of murder and child abuse resulting in death. The jury convicted Owens of second degree murder and child abuse resulting in death. The victim of both crimes was Owens's stepson, Kevonte Davis. The trial judge sentenced Owens to two consecutively-running 30 year terms in prison. The facts giving rise to these convictions are not in dispute.

Owens married Kenesha Davis in late July 2003, and lived with her in their Columbia, Maryland, townhouse. Also living with the couple were Davis's two children from a prior rela-

---

the Declaration of Independence. PROCEEDINGS OF THE CONVENTIONS OF THE PROVINCE OF MARYLAND, 1774–1776, at 202 (James Lucas & E.K. Deaver eds., 1836). Accordingly, the delegates enshrined the right in multiple places in the first Declaration of Rights. *Id.* at 311, 313 (Articles 3, 19, and 21). Recently we affirmed the fundamental character of the right to a jury trial in criminal cases. *Powell v. State,* 394 Md. 632, 646, 907 A.2d 242, 250 (2006).

7. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tionship: Dacquan Davis, age four; and Kevonte Davis, age 2; as well as the couple's seven month-old infant, Kemari Owens. In July 2003, Owens was unemployed, but Davis worked at a warehouse for the distributing firm, Genco, in Columbia where she typically worked from 7:00 a.m. until 5:30 p.m. The couple shared a single car so, each morning, Owens would drive the children to daycare, drop his wife off at Genco, and then return home. At the end of the work day, Owens would pick up the children and his wife and return home.

Owens deviated from that routine on the morning of 30 July 2003 when he took Davis to work directly, without dropping the children at daycare. Davis testified that Kevonte appeared normal when she exited the car. Kevonte, however, did not appear so when Owens picked Davis up from work approximately 10 hours later. Davis noticed that Kevonte had his eyes closed, was foaming at the mouth, had cold hands, and was "moaning like he was in pain." She and Owens took Kevonte to Howard County General Hospital ("the Hospital"), where the child died after approximately thirty minutes of failed attempts to revive him.

A number of witnesses from the Hospital medical staff testified at Owens's trial to the extent and possible causes of the injuries leading to Kevonte's death. The consensus of the testimony was that Kevonte sustained severe trauma on the level of a serious car accident or a fall off a building of several stories.[8] Several of the staff members also noted that Owens's explanation of Kevonte's activities during the critical 10 hours on July 23 was not consistent with the extent of his injuries. At about 6:30 p.m., Howard County Police Detectives Eric Kruhm and Vicki Shaffer encountered and interviewed Owens for 10 to 15 minutes in the playroom of the Hospital's pediatric ward, where he was tending Dacquan. That conversation, to which Owens was apparently a free participant, yielded some

---

8. Dr. Zabiullah Ali, an Assistant Medical Examiner, performed an autopsy on Kevonte and concluded that "the cause of death was multiple blunt force trauma" inflicted less than four to six hours before death.

additional background on the day's events. Owens indicated that the two older boys had spent the day playing and watching TV together and seemed relatively normal at lunch time. Around the time the children and Owens picked up Davis, however, Kevonte was "fussy" and difficult to keep awake. When asked how Kevonte received such heavy bruising, Owens attributed it to fighting with his four year-old brother, Dacquan. The detectives noted that Owens seemed nervous during their conversation.[9] The interview ended when Owens left the room. At that point, the detectives considered Owens a suspect in Kevonte's death.

Several hours later, around 9:48 p.m., the detectives conducted a second interview. The detectives approached Owens, who was in the Hospital parking lot, and asked him to come back inside for another interview. Owens complied with the request and also did not object to the audiotaping of the interview. The two plain-clothes detectives and their suspect, Owens, convened in an empty room in the pediatric ward, several doors down from the playroom where the first interview took place. The detectives took possession of Owens's car keys, but the record is not clear as to whether this occurred before or after the second interview.[10] During the interview, the detectives asked pointed questions about the circumstances surrounding the death of Kevonte. The interview lasted somewhere between 20 and 30 minutes and was terminated at Owens's initiative. The following exchange took place at the end of the interview:

[Owens]: Is there anything else before I go?

[Detective Kruhm]: You can leave at any time; we're not holding you in here anymore.

---

**9.** Detective Kruhm testified that "[a]t one point, [Owens banged] his head against the wall and muttered, 'Fucking up.' And then at another point in the conversation, between questions he said to himself, just audibly, 'How does this shit happen?' "

**10.** Despite some uncertainty, cross-examination of Detective Kruhm and the direct testimony of Owens seem to indicate that the keys were obtained prior to the second interview.

[Owens]: All right See you tomorrow.

The police arrested Owens two days later on 1 August 2003.

## II. PROCEDURAL HISTORY

### A. Non–Citizen Juror Issue

The jury in Owens's trial returned its verdict against him on 10 June 2004. Later that same evening, Steven Merson, the Howard County Jury Commissioner, received a voicemail message from Juror No. 10, Adeyemi Alade. Alade indicated that he was concerned about the propriety of his jury service because he was not a U.S. citizen. On 18 June 2004, the Circuit Court held a hearing regarding this revelation. At the hearing, Merson explained that Alade expressed concern for the status of the case because he had just learned that jury service was restricted to U.S. citizens. Merson testified that Alade indicated that he was qualified to serve as a juror on his pre-trial juror questionnaire. According to Merson, his office does not review for accuracy the responses provided by juror candidates unless some information is missing. Merson also confirmed that the videotape shown to potential jurors upon their arrival for service does not include information relating to qualification for service.

Alade testified that his "country of origin" was Nigeria and that he was not a U.S. citizen. Rather, he stated that he had been in the U.S. for two years as a "permanent resident," was attending university, and had obtained a valid Maryland driver's license, listing his Howard County residence address. Alade acknowledged that he checked the box on the juror questionnaire indicating that he was qualified to serve as a juror as an oversight and did not do so deliberately. Apparently, no one inquired into his citizenship status when he reported for possible jury duty and he was never asked about the subject at any point in the trial. For Alade's part, the court found no intent to misrepresent his status to the court.

Owens filed a Motion for a New Trial on the same day as the hearing. The rationale for the motion was that Owens was deprived of a lawful jury because Alade, as a non-U.S.

citizen, was not qualified to serve as a juror. The State argued that the citizenship requirement for jurors is confined to the realm of statutory rights, a right which Owens waived by not challenging Alade's service in a timely fashion. The Circuit Court, on 21 July 2004, denied Owens's motion. The court reasoned that neither the U.S. nor Maryland Constitutions mandate a jury composed of U.S. citizens only. As to Owens's contention that Alade's non-citizenship status could not reasonably have been discovered because *voir dire* questions relating to statutory disqualifications are not mandatory, the court pointed out that neither party sought a *voir dire* question on the subject of citizenship. Had it been proposed, the court ventured that the citizenship question would have been propounded to the jurors and Alade would have been disqualified as a juror.

### B. Suppression Issue

Prior to trial, Owens sought to suppress any statements he made to Detectives Kruhm and Shaffer during their two interviews. Owens argued that the conversations between him and the detectives occurred while he was in custody and must be suppressed because the detectives never advised him of his *Miranda* rights. The Circuit Court denied the motion to suppress the statements made during the interviews based on a totality of the circumstances analysis. The court examined numerous factors in concluding that the interrogation of Owens was not custodial, including: the neutral locations and short length of the interviews, the small number of officers present and their relaxed posture, whether Owens was a suspect and treated as such, Owens's willingness to commence the interviews, the lack of use of physical restraint, the absence of force or coercion, and that Owens was not placed under arrest.

### C. Review by the Court of Special Appeals

Owens noted timely an appeal to the Court of Special Appeals. The intermediate appellate court affirmed the judgment of the Circuit Court. As to both issues discussed previously, it relied on much the same grounds as expressed

by the trial court.[11] The intermediate appellate court conclud-
ed that Owens's right to a citizen jury was purely statutory,
not constitutional, in nature. *Owens v. State,* 170 Md.App. 35,
71, 906 A.2d 989, 1009 (2006). Because the *voir dire* process is
the means by which defendants are accorded the opportunity
to identify and challenge unqualified jurors, a failure to pose
proper questions and object during that time is equated to a
waiver of that opportunity. *Owens,* 170 Md.App. at 71–73, 906
A.2d at 1009–10. The Court of Special Appeals reinforced its
conclusion by examining *Kohl v. Lehlback,* 160 U.S. 293, 16
S.Ct. 304, 40 L.Ed. 432 (1895), a case where, in spite of a due
process argument, the Supreme Court refused to grant a post-
conviction objection to a non-citizen juror. *Owens,* 170 Md.
App. at 73, 906 A.2d at 1010. The appellate panel analogized
*Kohl* to several Maryland cases involving jurors whose statu-
tory disqualifications were discovered only after a verdict was
rendered and motions for new trials were denied because it
was held that the right to object to unqualified jurors had
been waived. *Owens,* 170 Md.App. at 73–77, 906 A.2d at 1010–
12. As for the custodial interrogation issue, the Court of
Special Appeals reasoned that the encounters between the
detectives and Owens were not very long and that a reason-
able person in Owens's position would have felt free to leave
the situations. *Owens,* 170 Md.App. at 99, 906 A.2d at 1025.
We granted Owens's petition for a writ of certiorari. 396 Md.
12, 912 A.2d 648 (2006).

### III. STANDARD OF REVIEW

#### A. Non–Citizen Juror Issue

■ In another case concerning the right to a jury trial,
albeit in the realm of civil law, we said that "[b]ecause our
interpretation of the Maryland Declaration of Rights and
Constitution, provisions of the Maryland Code, and the Mary-
land Rules are appropriately classified as questions of law, we
review the issues *de novo* to determine if the trial court was

---

11. Owens also raised a "sufficiency of the evidence" argument He does
 not pursue that in this Court.

legally correct in its rulings on these matters." *Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 80–81 (2004); *see also Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175, 184 (2006) ("where an order involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct' under a *de novo* standard of review"). Thus, because we are presented with legal questions on the constitutional and statutory soundness of a jury containing a non-citizen, we consider them *de novo.*

### B. Suppression Issue

■■■ In *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 443–44 (2003) (citations omitted), we stated the applicable standard of review regarding motions to suppress and determinations of custody for purposes of evaluating arguments asserting *Miranda* right violations:

> Our review ... is ordinarily "limited to the evidence presented at the suppression hearing." In conducting our analysis, we view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion .... We pay deference to the trial court's factual findings, upholding them unless "they are clearly erroneous." "[We] must make an independent constitutional evaluation," however, "by reviewing the relevant law and applying it to the unique facts and circumstances of the case."

> In determining whether there was custody for purposes of *Miranda,* we accept the trial court's findings of fact unless clearly erroneous. "We must, however, make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody."

## IV. DISCUSSION

### A. Non–Citizen Juror Issue

Owens advances two interrelated arguments in support of his position that the Maryland Constitution recognizes a right to a trial by a jury composed only of United States citizens.

He argues that the substantive due process component of Article 24 of the Declaration of Rights, guaranteeing that no person is to be "deprived of his life, liberty, or property, but by the judgment of his *peers*," [12] when informed by English common law made applicable through Article 5, means a "jury of *citizens*." Assertedly, English common law at the time of the Revolution required jurors to be citizens. This general rule, Owens contends, is proven by its exception: jury *de medietate linguae*,[13] the mechanism by which non-English citizens were tried, which permitted the jury to be composed of one-half citizens and one-half non-citizens.[14] 3 WILLIAM BLACKSTONE, COMMENTARIES *362 (1768). Thus, by the complimentary operation of Articles 5 and 24, Owens posits that the Declaration of Rights in the Maryland Constitution secures for defendants like himself the right to a trial by a jury of U.S. citizens. As a right of constitutional pedigree, it may be waived only upon a knowing and voluntary *Johnson v. Zerbst* [15]-type waiver by the defendant himself, a much harder waiver for the State to prove than must be shown for waiver

---

12. The phrase "judgment of [one's] peers" means "trial by jury." *Tichnell v. State*, 287 Md. 695, 714, 415 A.2d 830, 840 (1980) (citing *Wright v. Wright's Lessee*, 2 Md. 429, 452 (1852)).

13. This Latin phrase is translated to "of half-tongue," which is a reference to the fact that half of the jury speaks the same language as the defendant, and the other does not. BLACK'S LAW DICTIONARY 463 (8th ed.1999).

14. In the event that the requisite number of aliens could not be summoned, the common law permitted the trial to continue with a jury composed of as many aliens as possible, if any. RICHARD CLARKE SEWELL, A TREATISE ON THE LAW OF SHERIFF 357 (1845); 3 W.F. FINLASON, REEVES' HISTORY OF THE ENGLISH LAW 195 (1880); MAXIMUS A. LESSER, THE HISTORICAL DEVELOPMENT OF THE JURY SYSTEM 219, n.59 (1894); LLOYD E. MOORE, THE JURY: TOOL OF KINGS, PALLADIUM OF LIBERTY 58 (2d 3d.1988). The purpose of this procedure was to ensure an impartial jury, which was more likely to occur if some of the defendant's own countrymen were empanelled to dilute possible xenophobia on the part of the English jurors. 3 WILLIAM BLACKSTONE, COMMENTARIES *360 (1768); 2 FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW 623–24 n.3 (1898) (hereinafter POLLOCK & MAITLAND).

15. 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *see infra* note 41 and accompanying text.

of a statutory right. Even if the right to a citizen jury is of a statutory, rather than constitutional dimension, Owens maintains that he did not waive that right because our decision in *Boyd v. State*, 341 Md. 431, 439–40, 671 A.2d 33, 37 (1996), would have made his request for a *voir dire* question regarding citizenship potentially a futile effort.

The State responds by directing us to the U.S. Supreme Court's decisions in *Kohl* and *Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), implying that the U.S. Constitution does not mandate citizen juries. Additionally, the State argues that the Maryland Constitution is amenable to a similar interpretation, despite the common law practice of trials by jury *de medietate linguae.* Instead, Owens's right to a jury composed of U.S. citizens exists solely as a matter of statutory law, which right he waived by failing to request a *voir dire* question inquiring into the citizenship status of the venire.

■■■■ The Sixth Amendment to the U.S. Constitution guarantees the right to a trial by an impartial jury in criminal matters.[16] This right has been incorporated into the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, and is thereby applicable to Maryland and the several states. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *accord Miller v. Warden*, 16 Md.App. 614, 623–24, 299 A.2d 862, 868 (1973). The Maryland Constitution also provides for the right to a jury trial in several articles of its Declaration of Rights. Two of the provisions deal specifically with the right to a jury trial in criminal cases: Articles 21 [17] and 23,[18] but they are not espe-

---

**16.** The Sixth Amendment reads, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

**17.** "That in all criminal prosecutions, every man hath a right . . . to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty."

**18.** Article 23 provides, in relevant part: "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that

cially applicable in the present case.[19] Thus, we look to the provisions of Articles 5(a)(1) and 24, on which Owens bases his arguments, for guidance on the question of the right to a jury trial in Maryland.

Article 5(a)(1) of the Maryland Declaration of Rights provides as follows:

> That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; and also of all Acts of Assembly in force on the first day of June, eighteen hundred and sixty-seven; except such as may have since expired, or may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State . . . .

This provision has deep roots. Some iteration of its provisions has been an organ of the fundamental law of Maryland since 1776,[20] when the State declared its independence and formed

---

the Court may pass upon the sufficiency of the evidence to sustain a conviction."

19. Article 21, beyond its assurance of a jury trial generally, is not otherwise implicated in this case in its guarantee of a speedy trial by an impartial jury (as Owens has raised no issue of delay or a partial jury). Also not implicated in Owens's arguments is Article 23's direction that juries shall be the "judges of law," a somewhat antiquated provision since refurbished with judicial gloss concerning the true role of jurors as judges of "the law of the crime." In this role, jurors are empowered to interpret a statute in light of disputed facts to determine whether a crime has been committed. *Stevenson v. State*, 289 Md. 167, 176–80, 423 A.2d 558, 563–65 (1980). Owens has not alleged that this right has been curtailed.

20. Md. Const. of 1776, Decl. of Rts, art. 17 (1776); Md. Const. of 1851, Decl. of Rts, art. 3 (1851); Md. Const. of 1864, Decl. of Rts, art. 4 (1864); Md. Const. of 1867, Decl. of Rts, art. 5 (1867).

its Constitution. The origin of Article 5(a)(1) harkens to the popular sentiment among colonists that they should restore and guarantee the common law privileges, their birthright as Englishmen, of which England had wrongfully deprived them, including the right to trial by jury. *See supra* notes 4 and 5 and accompanying text; *see also* CHARTER OF MARYLAND art. X (1634) (guaranteeing the colonists of Maryland "all Privileges, Franchises and Liberties of this our Kingdom of England, freely, quietly, and peaceably to have and possess, and the same may use and enjoy in the same manner as our Liege–Men born, or to be born within our said Kingdom of England . . . ."). We turn now to the task of identifying the common law principles of English criminal jury trials in 1776.

### 1. The English Common Law of Jury Trials

To better understand the status of criminal jury trials at the time of the Revolution, we examine briefly the evolution of that institution in common law England. The earliest record of a primordial form of the criminal jury trial in English common law history may be attributed to the Saxon king, Ethelred the Unready (978–1013, 1014–16). Under Ethelred's law, 12 elders of a local community would be accompanied by a sheriff to swear on a religious relic and swear not to accuse an innocent man of a crime. MAXIMUS A. LESSER, THE HISTORICAL DEVELOPMENT OF THE JURY SYSTEM 134 (1894); WILLIAM FORSYTH, HISTORY OF TRIAL BY JURY 57 (2d ed. 1875). This form of accusation and conviction was replaced by the "frank-pledge" system, instituted by the Normans following their Conquest in 1066, which held every member of a community responsible for the conduct of his neighbors. LESSER, *supra* at 135–36 (citing FORSYTH, *supra* at 161). This system compelled neighbors to bring to justice the criminal element in their communities. *Id.* This led to another mode of trial by accusers making oaths, called voraths, against a defendant.[21] JOHN

---

21. The taking of oaths, also known as a "wager of law," later led to the practice of assembling witnesses, also known as compurgators or oath-helpers, to vouch for the veracity of the defendant's oath, FRANCIS STOUGHTON SULLIVAN, AN HISTORICAL TREATISE ON THE FEUDAL LAW, AND THE

Proffatt, A Treatise on Trial by Jury 25–26 (1877). A defendant would typically undergo an ordeal[22] or, under Norman rule, trial by combat.[23] Lesser, *supra* at 136 (citing Forsyth, *supra* at 194). Dissatisfaction with this rumor-driven, perilous process lead to reforms in the following centuries.

The criminal jury trial began to assume a form more recognizable to us under the reign of King Henry II. Among Henry II's innovations was his Assize of Clarendon, decreed in 1166, which brought under the jurisdiction of the royal courts serious crimes and felonies identified by an inquest, or a type of grand jury, of 16 men gathered from the vicinage.[24] Leon-

---

Constitution and Laws of England 273 (1772); 2 Pollock & Maitland, *supra* note 14, at 600–01.

22. Blackstone identifies various iterations of the fire and water ordeals in his *Commentaries on the Laws of England.* 4 William Blackstone, Commentaries *336–37 (1769). Apparently, a different kind of ordeal was reserved generally for accused clergy, which required them to attempt to swallow a large piece of bread without choking. Lesser, *supra* note 14, at 82.

23. Trial by battle, or "wager of battle," was usually conducted by "witnesses," or champions as they were better known, who swore to the truth of their litigant's claims. Francis Stoughton Sullivan, An Historical Treatise on the Feudal Law, and the Constitution and Laws of England 273 (1772). More is the pity, trial by battle was outlawed shortly after Pope Innocent III, by the Fourth Lateran Council in 1215, prohibited clergy from participating therein. 2 Pollock & Maitland, *supra* note 14, at 599; Lesser, *supra* note 14, at 142.

24. The term "vicinage" is descriptive of the fact that jurors all lived and held property in the immediate vicinity of the area where the disputed facts arose. Giles Duncombe, Trials Per Pais, or the Law of England Concerning Juries by Nisi Prius, & C. 90 (6th ed. 1718); 3 J.H. Thomas, A Systematic Arrangement of Lord Coke's First Institute of the Laws of England 365 (1836); John Proffatt, A Treatise on Trial by Jury 37, 39–40, 52 (1877). At this point in the evolution of jury trials, it was crucial that jurors have personal knowledge of the facts of the case because that was typically the only evidence available to aid them in reaching a verdict. Lesser, *supra* note 14 at 139; Proffatt, *supra* note 24, at 35; John Hawles, The English-Mans Right, *reprinted in* Justices and Juries in Colonial America 7 (1972) (1680). Around 1751, however, King George II abolished the vicinage requirement for criminal trials by statute. Proffatt, *supra* note 24, at 117 (citing 24 Geo II., ch. 18).

ARD W. LEVY, THE PALLADIUM OF JUSTICE: ORIGINS OF TRIAL BY JURY 11 (1999). These jurors were charged with the responsibility of speaking for the neighborhood as to their suspicions and accusations of criminal activity. *Id.* Once identified by this sworn jury, the defendant was faced with one of several possible ordeals. *Id.* This method of reaching a verdict was beginning to replace the older Saxon and Norman procedures of taking oaths of innocence and trial by battle. 2 FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW 598–603 (1898).

Steadily, advancements in the realm of civil trials under Henry II lead to the petit jury verdict's replacement of the ordeal as the final arbiter of criminal guilt or innocence. Contemporaneous with the Assize of Clarendon was the establishment of the assizes of *novel disseisin* (recent dispossession), *mort d'ancestor* (death of an ancestor), and *darrein presentment* (last presentment), which provided for final jury

---

This practice was imported to Virginia and other colonies. Harold M. Hyman & Catherine M. Tarrant, *Aspects of American Trial Jury History, in* THE JURY SYSTEM IN AMERICA 26 (Rita James Simon ed., 1975). Maryland attempted to have the Bill of Rights require federal courts to observe the vicinage standards of the state in which the court sat. EDWARD DUMBAULD, THE BILL OF RIGHTS AND WHAT IT MEANS TODAY 18 (1957). The U.S. Constitution is now said to have a "Vicinage Clause" or "Venue Clause" requiring trials to be held in the state where the offense is committed. U.S. CONST. art. III, § 2, cl. 3 ("The Trial of all Crimes ... shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed ...."); *see also* U.S. CONST. amend VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law ...."); *see generally* Steven A. Engel, *The Public's Vicinage Right: A Constitutional Argument,* 75 N.Y.U.L. REV. 1658 (2000); Drew L. Kershen, *Vicinage,* 29 OKLA. L. REV. 803 (1976). This is very different than the common law notion that the jury would be composed of the local inhabitants of where the crime occurred, which evoked controversy among some colonists. Hyman & Tarrant, *supra* note 24, at 33–34. *But see* William Wirt Blume, *The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue,* 43 MICH. L. REV. 59, 65–66 (1944) (arguing that the colonists' complaints were directed more to the idea of having to defend against actions being tried in other colonies, Nova Scotia, or England).

verdicts bearing on various issues of land possession. LEVY, *supra* at 13–14. The jurors in these cases were drawn from the vicinity and resolved the disputes before them based upon their knowledge of the facts at issue. *Id.* In 1179, Henry II promulgated the Grand Assize, a form of appeal from civil jury verdicts as to rightful possession of land, which called for yet another jury. *Id.* at 14. This jury was selected by the sheriff, who nominated 4 knights to complete the jury with 12 other knights hailing from the same neighborhood as situs of the land in question. *Id.* Again, these jurors relied on their knowledge of the facts to reach a decision. *Id.* at 14–15.

With the advent of the Magna Carta in 1215, the nobles of England secured for themselves,[25] in Article 39 of the Great Charter,[26] the right to a jury verdict in lieu of the more perilous methods of determining guilt or innocence. LESSER, *supra* at 142–43. Until that time, a petit jury verdict was only available for a price as a dispensation from the Crown.[27] *Id.* Two legal authorities of good repute from the period, Henry de Bracton and the *Fleta,* indicated that criminal jury trials

---

**25.** Several scholars have noted that this right was available to "freeman," that is, the land-owning nobles only, and not the general non-landed populace, known as villeins. SAMUEL W. MCCART, TRIAL BY JURY 5 (1964); WILLIAM SHARP MCKECHNIE, MAGNA CARTA: A COMMENTARY ON THE GREAT CHARTER OF KING JOHN 287 (2d ed.1914). The nobles compelled King John to assent to this provision of the Magna Carta to prevent the kind of arbitrary justice doled out by the Crown's own judges and place the nobles' fates in the hands of their equals, or peers: other nobles. MCCART, *supra* note 25, at 5; DUNCOMBE, *supra* note 24, at 132–33.

It was not until 1275, when King Edward I signed the First Statute of Westminster, 3 Edw. 1, ch. 39, that jury trials were made available to non-landed defendants. 1 EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND *169–70 (1797); MCCART, *supra* note 25, at 5–6. The principle of a jury of one's peers did not exist in precisely the same way for the villeins. Because the property qualification still existed for jury service, villeins were still not permitted to serve as jurors. DUNCOMBE, *supra* note 24, at 7; 3 BLACKSTONE, *supra* note 14, at *362. Thus, villeins were judged by their hierarchal superiors.

**26.** "No freeman shall be taken or imprisoned or disseised or outlawed or exiled or in any way ruined, nor will we go or send against him, except by the lawful (judgment) of his peers or by the law of the land." MAGNA CARTA, art. 39.

**27.** The Magna Carta purported to make this right to a trial by jury available without charge. "To no one will we sell, to no one will we refuse or delay, right or justice." MAGNA CARTA, art. 40.

had become typical by the end of the 13th century.[28] *Id.* at 143; *see supra* note 25. This may have been attributable in large measure to the abolition of the trial by ordeal around 1215, *see supra* note 22, which left judges with few desirable alternatives for trying the guilt of defendants. LESSER, *supra* at 145. Beginning in the 1300s, the petit and grand juries finally emerged as bodies of distinct jurors. In 1352, King Edward III agreed to a statute empowering defendants to challenge petit jurors because of their service on the grand jury that indicted the defendant. LEVY, *supra* at 22. Another development in the ancient jury trial, making it resemble closer our modern institution, was the move away during the reign of King Henry III from the jurors as witnesses, which became normal practice by the mid–15th century.[29]

The qualifications for jury service remained principally unchanged over the many centuries of the common law's development. A juror was required to be a land-owning (freeholder, or freeman)[30] male[31] possessing land and chattel of a

---

**28.** Interestingly, some defendants, particularly those who felt that the evidence against them would invariably condemn them before a jury (who were liable to be punished for unwarranted acquittals), objected to the jury trial because they felt more confident in subjecting themselves to trial by combat or compurgation. LESSER, *supra* note 14, at 145–46.

**29.** As early as 1218, process was served for witnesses separate from the jury to convene with the jurors and there is a record of a trial being conducted based on the opinion of jurors and document witnesses. LLOYD E. MOORE, THE JURY: TOOL OF KINGS, PALLADIUM OF JUSTICE 56–57 (2d ed.1988); *see also* LEONARD W. LEVY, THE PALLADIUM OF JUSTICE ORIGINS OF TRIAL BY JURY 22–23 (1999).

**30.** It is by virtue of the land-owning requirement that citizenship became an indirect qualification for jury service. Because only citizens could own land or hold an estate or sufficient value, non-citizens were disqualified necessarily. 3 BLACKSTONE, *supra* note 14, at *362. Relatedly, slaves and villeins could not be jurors because they, too, lacked the ability to own land for themselves. *Id.;* 1 W.F. FINLASON, REEVES' HISTORY OF THE ENGLISH LAW 353–54 n.b (1880). The property qualification for non-citizens was waived in the instances of which required a jury *de medietate linguae.* 3 BLACKSTONE, *supra* note 14, at *362–63; *see supra* note 14 and accompanying text.

**31.** 3 BLACKSTONE, *supra* note 14, at *362; DUNCOMBE, *supra* note 24, at 85. Women were only permitted on juries (in fact the entire jury had to

specified value who dwelled in the general area from which the disputed question arose.[32] 3 BLACKSTONE, *supra* at \*362; GILES DUNCOMBE, TRIALS PER PAIS, OR THE LAW OF ENGLAND CONCERNING JURIES BY NISI PRIUS, & C. 7, 85–88, 103, 123 (6th ed. 1718). Jurors also had to be lawful, that is, not outlawed for some illegal act previously done. DUNCOMBE, *supra* at 85; 3 BLACKSTONE, *supra* at \*363–64. Jurors could also be challenged for possible partiality, insufficient age, and occupation as a clergymen or member of Parliament. 3 BLACKSTONE, *supra* at \*361, 363, 364.

In summary, the practice of the criminal jury trial in English common law at the time of the Revolution stood as follows. A grand jury was assembled to indict a defendant based upon eye-witness testimony and other evidence. Then, a petit jury of 12 free, land-holding, lawful men worth a certain amount of money from the general area of the situs of the crime determined the correctness of the indictment based on testimony from witnesses and instructions of law from judge.

As its language indicates, Article 5(a)(1) of the Declaration of Rights avails Marylanders of the common law of England as it existed at the time Maryland declared its independence.[33] *Id.*, *State v. Canova*, 278 Md. 483, 486, 365 A.2d 988, 990 (1976). We, however, have made clear in our cases, as does Article 5(a)(1) itself, that this imported common

---

be composed of women) to decide the factual question of whether a woman was pregnant. This was achieved by the writ *de ventre inspiciendo*. 3 BLACKSTONE, *supra* note 14, at \*362.

32. It is said that a jury should be "of the country" of the defendant. Contrary to Owens's assertions, this was not meant to be taken to imply citizenship. Rather, the phrase was a reference to the "country-side," or the general vicinity of the where the crime occurred. 3 BLACKSTONE, *supra* note 14, at \*359–60; 2 POLLOCK & MAITLAND, *supra* note 14, at 624 n. 1; PROFFATT, *supra* note 24, at 117.

33. Maryland is the only state of the thirteen colonial states that retains an express constitutional guarantee of English common law from the

law is subject to change and repeal by appellate courts and the Legislature. *Stearman v. State Farm Mut. Auto. Ins. Co.,* 381 Md. 436, 454, 849 A.2d 539, 550 (2004); *Spitzinger v. State,* 340 Md. 114, 129, 665 A.2d 685, 692 (1995); *Miles Laboratories, Inc. Cutter Laboratories Div. v. Doe,* 315 Md. 704, 724, 556 A.2d 1107 1117 (1989); *Jones v. State,* 303 Md. 323 n. 10, 337 493 A.2d 1062, 1069 n. 10 (1985) ("The common law rule may, within constitutional constraints, be changed or modified by legislative enactment or judicial decision where it is found to be a vestige of the past, no longer suitable to the circumstances of our people."); *Lutz v. State,* 167 Md. 12, 15, 172 A. 354, 356 (1934); *Gladden v. State,* 273 Md. 383, 389, 330 A.2d 176, 180 (1974); *Denison v. Denison,* 35 Md. 361, 378 (1872); *Coomes v. Clements,* 4 H. & J. 480, 481 (1819). It is the province of this and other courts to adjudge whether the common law of England at the time of the Revolution remains a valid portion of the law of Maryland. *Ireland v. State,* 310 Md. 328, 331, 529 A.2d 365, 366 (1987) ("The determination of the nature of the common law as it existed in England in 1776, and as it then prevailed in Maryland either practically or potentially, and the determination of what part of that common law is consistent with the spirit of Maryland's Constitution and her political institutions, are to be made by this Court."); *Gilbert v. Findlay College,* 195 Md. 508, 513, 74 A.2d 36, 38 (1950).

The common law also may be abrogated by a statute or statutory scheme when the Legislature's act addresses the *whole subject matter* [34] on which the common law

---

time independence was declared. At least two of these states formerly had such constitutional provisions. DEL. CONST. of 1776, art. 25 (1776); N.Y.CONST. of 1777, § 35 (1777). Several of the colonial states have current statutes to the same effect. GA. CODE ANN., § 1–1–10(c)(1) (2006); N.C. GEN. STAT. § 4–1 (2006); 1 PA. CONS. STAT. ANN. § 1503(a) (2006).

**34.** There may be occasions where the General Assembly has dealt piecemeal with a particular subject-matter, which only repeals the

spoke or the common law and the legislative enactments may not co-exist independently. *Stearman*, 381 Md. at 454, 849 A.2d at 550 (quoting *State ex rel. Sonner v. Shearin*, 272 Md. 502, 510, 325 A.2d 573, 578 (1974)) ("When the common law and a statute collide, the statute, if constitutional, controls."); *Robinson v. State*, 353 Md. 683, 693, 728 A.2d 698, 702–03 (1999) (citing *Lutz v. State*, 167 Md. at 15, 172 A. at 356) ("Where a statute and the common law are in conflict, or where a statute deals with an entire subject-matter, the rule is otherwise, and the statute is generally construed as abrogating the common law as to that subject."); *Hitchcock v. State*, 213 Md. 273, 279, 131 A.2d 714, 716 (1957) ("Where the Legislature undertakes to deal with the whole subject matter, there is an exception to the general rule that repeal by implication is not favored ...."); *Watkins v. State*, 42 Md.App. 349, 353–54, 400 A.2d 464, 467 (1979). Thus, notwithstanding whatever merit may inhere in Owens's English common law argument, if the Maryland statutory scheme prescribing the qualifications for jury service overbears completely the common law as it existed at the time of the Revolution, Article 5(a)(1) of the Maryland Declaration of Rights offers no support for Owens's argument for a constitutional right to a jury composed of U.S. citizens. We examine that statutory scheme.

### 2. *Maryland's Statutory Juror Qualification Scheme*

The Maryland Rules reiterate that the right to a jury trial is preserved in the Circuit Courts as it is guaranteed by the Maryland Constitution and Declaration of Rights. Maryland Rule 4–311(a). Maryland Code, Courts and Judicial Proceedings Article, § 8–102(a) states that when a criminal defendant is entitled to a petit jury, "the jury shall be selected at random from a fair cross section of the citizens of the State who reside in the county where the court convenes." Md.Code (1973,

common law to that limited extent. *See Robinson v. State*, 353 Md. 683, 693, 728 A.2d 698, 702 (1999) (citing *Lutz v. State*, 167 Md. 12, 15, 172 A. 354, 356 (1934)); NORMAN J. SINGER, 2B SUTHERLAND STATUTORY CONSTRUCTION § 50:5 (6th ed.2000).

2002 Repl.Vol.), Cts. & Jud. Proc., § 8–102(a) (hereinafter "Cts. & Jud. Proc.").[35] The Article also specifies that either a jury commissioner or the clerk of the court should manage the jury selection process with the end goal of establishing procedures that "assure the random selection of a fair cross section of the citizens of the State who reside in the county where the court convenes." Cts. & Jud. Proc., § 8–202(2). Among those procedures is the provision of a "juror qualification form" to be mailed to potential jurors asking them, among other things:[36] their race and national origin, length of residence within the county, and any other questions within the purview of the statutes concerning jury selection. *Id.* § 8–202(5)(i). The Courts and Judicial Proceedings Article further provides that "[a] person may not be disqualified or excused from jury service except on the basis of information provided by the juror qualification form" and leaves the determination of qualifications to the jury judge, on his or her initiative, or by recommendation of the jury commissioner or clerk of the court, as the case may be. Cts. & Jud. Proc., § 8–207(a).

■ Under the Article, "[a] person is qualified to serve as a juror unless he [or she]: (1) Is not constitutionally qualified to vote in the county where the court convenes . . . ."[37] Cts.

---

**35.** All references to the Courts and Judicial Proceedings Article are to the 2002 Replacement Volume in effect at the time of Owens's arrest. Since then, the General Assembly revised the Article, which changed the substance and organization of applicable provisions.

**36.** The form also addresses other points of possible disqualification, including: prior jury service, physical or mental infirmities, ability to communicate in the English language, and any pending felony crime charges or unpardoned felony convictions. Cts. & Jud. Proc., § 8–202(5)(i).

**37.** The statute also disqualifies those who are: unable to communicate in the English language, incapable of rendering satisfactory jury service by reason of mental or physical infirmity, charged or convicted (without pardon) of a felony, charged or convicted of misrepresenting a material fact on a juror qualification form for the purpose of avoiding or securing service as a juror, party to a civil suit where a jury trial is permitted in the court where the juror is called to serve, under 18 years

& Jud. Proc., § 8–207(b)(1). The Maryland Constitution, in turn, states that "no person shall vote . . . unless his [or her] name appears in the list of registered voters . . . ." MD. CONST. art. I, § 2. In order to be registered to vote, an individual must be "a citizen of the United States . . . ." Md.Code (2002), Election Law Article, § 3–102(a)(1). Thus, the Courts and Judicial Proceedings Article requires indirectly, among other qualifications, that jurors be citizens of the United States.

We believe that this broad and detailed statutory scheme for selecting qualified jurors encompasses the same, if not greater, body of law addressed in the English common law extant in 1776. Importantly, the statute discusses clearly the same citizenship requirement that existed implicitly at common law, thus abrogating the older common law rule.[38] This renders inconsequential Owens's *"de medietate linguae* argument."

Properly understood, Owens's argument contends that because the *de medietate linguae* exception was not formally abolished by the Maryland General Assembly until 1809 [39] proves that the common law embraced that concept in 1776. Therefore, if the exception were still in place at common law, its existence demonstrates that citizenship was a qualification for jury service in 1776. This is irrelevant because, as Owens points out, the Legislature created an express statutory citizenship qualification for jury service as early as 1973. Md. Code (1957, 1972 Repl.Vol.), Article 51, § 1. We have noted previously that a statutory enactment may abrogate complete-

of age, or unable to pass any other objective test prescribed by the Court of Appeals. Cts. & Jud. Proc., § 8–207(b)(2)–(9).

**38.** We also note that other, now objectionable, criteria for juror disqualification, such as inadequate property or monetary holdings and being of the female sex, were explicitly abrogated in the statutory scheme. Cts. & Jud. Proc., § 8–103 ("A citizen may not be excluded from service as a grand or petit juror in the courts of the State on account of race, color, religion, sex, national origin, or economic status.").

**39.** Chapter 138, § 15 of the Acts of 1809.

ly a common law principle, rendering it of no effect. The 1973 statute creating the citizenship qualification did just that.

### 3. Due Process Does Not Mandate a Citizen Jury

Turning to Owens's second constitutional argument for the right to a citizen jury, we consider whether the substantive due process components of either the U.S. or Maryland Constitutions acknowledges such a right. Decisions of the U.S. Supreme Court make clear that the federal Constitution does not require that jurors be U.S. citizens. *Carter,* 396 U.S. at 332, 90 S.Ct. at 525, 24 L.Ed.2d 549 (1970); *Kohl,* 160 U.S. at 300, 16 S.Ct. at 306, 40 L.Ed. 432 (1895); *Jugiro v. Brush,* 140 U.S. 291, 297–98, 11 S.Ct. 770, 772, 35 L.Ed. 510 (1891); *Hollingsworth v. Duane,* 4 U.S. (4 Dall.) 353, 1 L.Ed. 864 (1801). Owens's protestations that the Supreme Court precedent is stale, and possibly tainted by some vague prejudice because it emerged from the same era as the infamous *Plessy v. Ferguson* [40] case, are unavailing. First, the Supreme Court reaffirmed, in its 1970 *Carter* decision, the essence of its dicta in *Kohl. Carter,* 396 U.S. at 332, 90 S.Ct. at 525, 24 L.Ed.2d 549. Second, courts since *Kohl* concurred routinely in this analysis. *See, e.g., United States v. Gordon–Nikkar,* 518 F.2d 972, 976–77 (5th Cir.1975). *United States v. Armsbury,* 408 F.Supp. 1130, 1135 (D.Or.1976). *Perkins v. Smith,* 370 F.Supp. 134, 138 (D.Md.1974), *aff'd,* 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976); *State v. Mendoza,* 227 Wis.2d 838, 596 N.W.2d 736, 742 n. 5 (1999); *Commonwealth v. Acen,* 396 Mass. 472, 487 N.E.2d 189, 195 (1986).

Maryland law does not provide any firmer footing for Owens's argument. The Maryland Constitution makes no express guarantee of a trial by a citizen jury and no opinion of this Court construes it as such. The only support Owens can marshal in favor of his Maryland due process claim is a few sentences of dicta from a 1983 Court of Special Appeals

---

40. *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (upholding the principle of "separate, but equal" in the segregation of the black and white races).

opinion linking the phrases "jury of peers" to "jury of citizens." *Lawrence v. State,* 51 Md.App. 575, 581, 444 A.2d 478, 482 (1982). In *Lawrence,* the intermediate appellate court correctly parsed the words "judgment of his peers" from Article 24 of the Declaration of Rights as signifying a jury trial. 51 Md.App. at 581, 444 A.2d at 482 (citing *Wright,* 2 Md. at 452); *see supra* note 11. The court then referred inexplicably to *Black's Law Dictionary* to further illuminate the constitutional significance of the term "peer." 51 Md.App. at 581, 444 A.2d at 482. The dictionary indicated that peers are equals, a definition from which the Court of Special Appeals derived the contextually unwarranted and facile conclusion that " 'trial by a jury of his peers' means 'trial by a jury of citizens.' " *Id.* The general utility of *Black's Law Dictionary* notwithstanding, such a reference is not a controlling or persuasive authority in construing the Maryland Constitution and Declaration of Rights. The intermediate appellate court would have been better advised to halt its inquiry into the phrase "judgment of his peers" at this Court's precedent in *Wright* interpreting it as simply a trial by jury. This is the latter-day construction of the peerage principle discussed previously, which limited the privilege of jury trials to the landed gentry of 13th century England. *See supra* note 25.

### *4. Waiver of the Statutory Right to a Citizen Jury*

Because we hold that the right to a jury composed of U.S. citizens is of a statutory, rather than constitutional, dimension, we consider whether Owens waived this right under applicable standards. *Cubbage v. State,* 304 Md. 237, 241, 498 A.2d 632, 634–35 (1985) ("Just as constitutional rights may be waived, so may nonconstitutional rights be waived."). As opposed to waiver of a constitutional right, which ordinarily must meet more stringent standards,[41] a statutory right may

---

**41.** "A waiver [of the fundamental right to a jury trial] is valid and effective only if made on the record in open court and if the trial judge determines, after an examination of the defendant on the record and in

be deemed waived by a lesser showing. Generally, "most rights, whether constitutional, statutory or common-law, may be waived by inaction or failure to adhere to legitimate procedural requirements." *State v. Rose*, 345 Md. 238, 248, 691 A.2d 1314, 1319 (1997). In the case of the statutory right to a citizen jury, there exist three levels of screening to preserve that right. *Boyd*, 341 Md. at 441, 671 A.2d at 38 ("Maryland courts screen juror qualifications on at least three levels: a statutorily-required qualification form, appearance before the jury judge or commissioner at the courthouse, and the trial judge's observance of each juror during the *voir dire*."). In the event that the court's internally-administered means of automatically disqualifying prospective jurors has failed to eliminate a disqualified juror,[42] we have recognized

---

open court, that it was made 'knowingly and voluntarily.' " *Powell v. State*, 394 Md. 632, 646, 907 A.2d 242, 250 (2006) (interpreting Maryland Rule 4-246(b)). In order for the waiver to be both "knowing" and "voluntary," the " 'trial judge must be satisfied that there has been an intentional relinquishment or abandonment of a known right or privilege.' " *Powell*, 394 Md. at 639, 907 A.2d at 246 (quoting *Smith v. State*, 375 Md. 365, 379, 825 A.2d 1055, 1064 (2003)); *accord Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Further, only a defendant, and not his attorney, may waive this right. *Powell*, 394 Md. at 646, 907 A.2d at 250 (citing *Smith*, 375 Md. at 379–81, 825 A.2d at 1064); *State v. Collins*, 265 Md. 70, 80, 288 A.2d 163, 168–69 (1972).

**42.** As the Court of Special Appeals noted below, "[w]hile [Owens] may have assumed that the venire panel had been pre-screened based on the jury questionnaire, it is easy to anticipate that mistakes do occur, which is why a questionnaire alone is not the sole tool used to select a jury." *Owens v. State*, 170 Md.App. 35, 73, 906 A.2d 989, 1010 (2006). Over 120 years ago, we noted the same possibility of error on the part of those administering the jury selection process on behalf of the court as reason for *voir dire* challenges in the first instance. *Johns v. Hodges*, 60 Md. 215, 221–22 (1883) ("The right of challenge itself is a safeguard provided by law in contemplation of the contingency that the officers whose duty it is to select only qualified persons have failed in the performance of that duty. It is a means specially provided by which a party to a suit may readily and effectually protect himself against any oversight or neglect committed in the original selection."). In the present case, the jury commissioner for Howard County readily acknowledged that his staff did not confirm the veracity of the information contained on juror questionnaires and the orientation session also failed to address citizenship as a qualification. Under those circum-

the *voir dire* process as a proper procedural occasion to verify juror qualifications. *Williams v. State,* 394 Md. 98, 112, 904 A.2d 534, 542 (2006) ("[V]oir dire is the mechanism by which we give substance to the constitutional guarantee to criminal defendants of a fair and impartial jury trial."); *see Jenkins v. State,* 375 Md. 284, 331, 825 A.2d 1008, 1035 (2003); *Dingle v. State,* 361 Md. 1, 9, 759 A.2d 819, 823 (2000) (citing *Boyd,* 341 Md. at 435, 671 A.2d at 35, *Grogg v. State,* 231 Md. 530, 532, 191 A.2d 435, 436 (1963), *Hill v. State,* 339 Md. 275, 280, 661 A.2d 1164, 1166 (1995), and *Bedford v. State,* 317 Md. 659, 670, 566 A.2d 111, 116 (1989)). Thus, a defendant's failure to pursue the opportunity to question prospective jurors as to citizenship during *voir dire* constitutes a waiver of the statutory means of protecting the right to a citizen jury. *See Hunt v. State,* 345 Md. 122, 144, 691 A.2d 1255, 1265–66 (1997) (construing Cts. & Jud. Proc. § 8–211) (holding that if a party fails to pose a challenge to a potential juror after *voir dire,* that party "has lost the statutory remedy and must labor under constitutional or common law principles.").

The record in this case reveals that Owens did not propose any questions for the judge to ask of the venire regarding the citizenship status of the potential jurors, including the non-citizen, Alade. Owens argues, however, that his request for such a *voir dire* question would have been futile because our precedent in *Boyd* leaves it to the discretion of the trial court whether actually to put the question to the venire. In *Boyd,* the Court reviewed two consolidated appeals raising the issue of whether it was an abuse of discretion for a trial judge to refuse to ask the venire a *voir dire* question seeking to discover any potential jurors with physical infirmities that may compromise their ability to serve. 341 Md. at 433, 671 A.2d at 34. The defendants argued that under *Davis v. State,* 333 Md. 27, 633 A.2d 867 (1993), and *Casey v. Roman Catholic Archbishop,* 217 Md. 595, 143 A.2d 627 (1958), it was mandatory for the court to pose the question. The *Boyd* Court distinguished

stances, it is not difficult to imagine how non-citizens such as Alade sometimes end up on venire panels.

*Casey,* which concerned a *voir dire* question seeking to uncover bias, from the *Boyd* cases, which concerned *voir dire* questions directed to the minimum statutory qualifications for jury service. In neither of the consolidated cases in *Boyd* was the physical impairment question attributable to any specific bias linked to the armed robbery and second-degree murder charges faced by the defendants. 341 Md. at 438, 671 A.2d at 36–37. Further, the question would not have uncovered an automatic cause for disqualification. *Boyd,* 341 Md. at 438, 671 A.2d at 37. Our predecessors in *Boyd* also distinguished *Davis* on the ground that it concerned *voir dire* questions seeking to expose bias on the part of potential jurors rather than their ability to meet minimum statutory qualifications. *Id.* Also, the bias question in *Davis* would not have exposed grounds for immediate disqualification. *Boyd,* 341 Md. at 439, 671 A.2d at 37. Although *Davis* indicated that questions bearing on the satisfaction of the minimum statutory qualifications fell generally into the category of mandatory questions, the key inquiry was whether the given inquiry would be "reasonably likely to reveal cause for disqualification." 333 Md. at 35–36, 633 A.2d at 871.

Based on these distinctions, the *Boyd* Court opined that the defendants' requested question regarding physical infirmities was not mandatory because it "would not be reasonably likely to lead to [discovery of] cause for disqualification of a juror." 341 Md. at 440, 671 A.2d at 37. First, as in *Casey* and *Davis,* a physical disability would not have served as an automatic cause for disqualification. *Id.* Even if a disability were discovered, accommodations are more likely to precede dismissal. *Id.* Second, *Boyd* stated that posing questions already covered by the processes preceding *voir dire* would be "redundant and unnecessary." 341 Md. at 441, 671 A.2d at 38. Thus, *Boyd* ostensibly stands for the proposition that *voir dire* questions concerning the minimum statutory qualifications of a potential juror are only mandatory should they reflect a reasonable likelihood of bias or prejudice against the defendant. It is this rationale that Owens invokes in his argument that he did not waive his right to challenge a non-citizen juror.

Essentially, he complains that because *Boyd* leaves it entirely to the trial judge's discretion whether to pose a citizenship question in a case where citizenship is not a likely source of bias, his request of such a question would have been futile. We cannot agree entirely with this complaint.

The rule in *Boyd* that *voir dire* questions concerning minimum statutory qualifications are not mandatory when sought was animated, in part, by a belief that such questions duplicate needlessly the efforts of the pre-*voir dire* screening methods which focus on statutory disqualifications. That cases such as the present one occur demonstrate a correctable weakness in this reasoning. Because the pre-*voir dire* screening methods failed to identify and excuse Alade, a non-citizen, it is evident that *voir dire* questions regarding minimum statutory qualifications are not always "redundant and unnecessary." [43] In fact, our cases ruminate that the pre-*voir dire* processes of screening out disqualified jurors are not fail-safe. *See supra* note 42. We are persuaded, and so hold, that it is in the better interests of justice to require trial judges to pose *voir dire* questions directed at exposing constitutional and statutory disqualifications when requested by a party. Accordingly, we overrule *Boyd* to the extent that it conflicts with this holding.

Notwithstanding our limited overruling of *Boyd,* the result in this case is not affected. Simply because it is *not mandatory* for a judge to pose a particular question does not make it a *prohibited* question. Had Owens sought, and the trial judge refused, a citizenship question in the present case, the propriety of the denial would have been preserved for appellate review as an abuse of discretion. But because Owens did not suggest the question, he may not complain reasonably that a non-citizen was empanelled on his jury. Indeed, the Circuit Court noted in its opinion denying Owens's

---

**43.** In fact, it is conceivable that, on the whole, more time is saved and the interests of judicial economy advanced by spending a relatively few minutes asking rote questions rather than risking the possibility of requiring a new trial by sparing those few minutes of additional *voir dire* questions.

motion for a new trial that "[h]ad such a question been requested, the court would in all likelihood have made the inquiry (as it did *sua sponte* regarding the issue of pending jury trials) and Mr. Alade would have been excused as a disqualified juror." *Owens,* 170 Md.App. at 59, 906 A.2d at 1002. We agree with the intermediate appellate court that there is no reason not to credit the Circuit Court on this point. *Owens,* 170 Md.App. at 77, 906 A.2d at 1012.

There exist several persuasive authorities supplying examples of waived objections to potential jurors who otherwise would have been disqualified had a defendant proposed and a judge asked a pertinent *voir dire* question. In *Kohl,* the Supreme Court held that a defendant's failure to object to the non-citizen status of a juror as a disqualification, whether done voluntarily, negligently, or unknowingly, was not grounds to upset the murder conviction against the defendant. 160 U.S. at 302, 16 S.Ct. at 307. In *Hansel v. Collins,* this Court held that a defendant waived his objection to a West Virginia resident serving on the jury that found him liable for trespass when he waited four months after the verdict to raise his objection and could not show that the presence of the out-of-state resident prejudiced him. 180 Md. 100, 103, 23 A.2d 1, 2–3 (1941). The Court stated that the defendant's ignorance of the juror's non-resident status was immaterial because he just as easily could have inquired into the matter. 180 Md. at 104, 23 A.2d at 3. In *Johns v. Hodges,* our predecessors concluded that a trial court did not abuse its discretion in refusing to grant a new trial to a defendant who, after the case was decided against him, discovered that two jurors empanelled to hear the matter were below the minimum statutory age for jury service. 60 Md. 215, 220 (1883). The *Johns* Court reasoned that the defendant should not have assumed that the statutory screening devices produced an entire jury of qualified persons, but rather, he should have undertaken to protect his interests through his own inquiry. 60 Md. at 222–23.

Maryland appellate cases also demonstrate that even when a *voir dire* question is posed to the venire, false or withheld responses do not necessarily entitle the defendant to a new

trial. *See, e.g., Hunt,* 345 Md. at 144–46, 691 A.2d at 1265–66 (citing *United States v. Boney,* 977 F.2d 624, 633 (D.C.Cir. 1992)); *Leach v. State,* 47 Md.App. 611, 618–19, 425 A.2d 234, 238–39 (1981) (refusing to strike a juror, who upon cross-examination at trial, was discovered to be an old neighbor and acquaintance of a State's witness when the trial judge was satisfied that the juror had no bias); *Burkett v. State,* 21 Md.App. 438, 445, 319 A.2d 845, 849 (1974) (refusing to grant new trial on the ground that an unbiased juror inadvertently failed to reveal that he was the father of a secretary in the State's Attorney's Office, despite *voir dire* question asking jurors to reveal their relation to any prosecutor's office personnel).

Most instructive is *Hunt v. State,* where a prospective juror, Diana Void, was arrested on a misdemeanor theft charge several days after returning her juror qualification form, on which she stated (then-truthfully) that she had not been charged or convicted of a serious crime. 345 Md. at 140–41, 691 A.2d at 1263–64. When summonsed for jury service, Void failed to respond affirmatively to questions regarding pending criminal charges during her orientation and, again, during *voir dire. Hunt,* 345 Md. at 141, 691 A.2d at 1264. Subsequent to his conviction, during a second petition for post-conviction relief, the defendant, Hunt, challenged Void's presence on the jury that convicted him on the ground that she was disqualified statutorily. The Court disagreed with Hunt's argument, concluding that because Void had been empanelled, Hunt lost the opportunity to exercise the statutory remedy of challenging jurors. *Hunt,* 345 Md. at 145–46, 691 A.2d at 1266.

Owens argues that his situation is different than the scenario presented in *Hunt* because his objection to an unqualified juror came much closer in time after the verdict. *Hunt* and our other appellate decisions belie any validity in this point of distinction. Although the objection raised in *Hunt* came during the defendant's second petition for post-conviction relief, the Court did not rely on length of delay in denying the objection. Rather, the Court specifically noted that the statutory right to challenge a juror expires at least as early as

when a juror is empanelled.[44] *Hunt,* 345 Md. at 145–46, 691 A.2d at 1266. This principle also is illustrated in *Leach,* where the Court of Special Appeals upheld a trial court's decision not to strike a juror who was discovered during cross-examination at trial to have been an acquaintance of a State's witness. 47 Md.App. at 618–19, 425 A.2d at 238–39. Even in 19th century practice, the Court of Appeals noted that "[t]he usual method is by challenge before the juror is sworn or the trial begins." *Johns,* 60 Md. at 221.

*Hunt* indicates that the reason for this narrow allowance of time for statutory challenges to juror qualifications advances the "goal of finality in judicial decision-making." 345 Md. at 144, 691 A.2d at 1266. Owens mistakenly argues that because he raised his objection to the non-citizen juror within the ten-day post-trial motion period, the concerns of finality and judicial economy are not impacted. A verdict was reached by, what appeared to the trial judge to be, *impartial* jurors.[45] After Alade's non-citizen status was revealed, the trial judge held a hearing on the matter and satisfied himself that there was "no showing that Mr. Alade's non-citizen status in any way or manner prejudiced the Defendant's case, his consideration of the evidence, or the jury's deliberations." [46]

---

**44.** The Court emphasized that although the statutory challenge is no longer available at this stage, a constitutionally-based challenge remains an option. *Hunt v. State,* 345 Md. 122, 145–46, 691 A.2d 1255, 1266 (1997).

**45.** In the end calculus, the primary concern in guaranteeing a defendant a jury trial is that the trial be heard by a fair and impartial jury, untainted by bias or prejudice. MD. CONST. of 1867, DECL. OF RTS, art. 21 (1867); *Williams v. State,* 394 Md. 98, 112, 904 A.2d 534, 542 (2006). Should an unqualified juror be empanelled, courts are satisfied generally with the verdict when the record establishes that the juror did not evade intentionally disqualification and that his or her service was performed without bias. *See, e.g., Williams,* 394 Md. at 112, 904 A.2d at 542; *Leach v. State,* 47 Md.App. 611, 618–19, 425 A.2d 234, 238–39 (1981); *Burkett v. State,* 21 Md.App. 438, 445, 319 A.2d 845, 849 (1974).

**46.** The burden to demonstrate partiality rests with the challenging party, which, in this case, is Owens. *Hunt,* 345 Md. at 146, 691 A.2d at 1267 (citing *Davis v. State,* 333 Md. 27, 38, 633 A.2d 867, 873 (1993)).

Related to the goal of judicial economy is the object of integrity of the process. Our cases highlight the necessity for foreclosing statutory challenges to jurors after *voir dire* in the interests of preventing an abuse of those challenges. In *Hansel,* our predecessors noted the wisdom of the earlier *Johns* decision, admonishing courts not to allow new trials based on challenges to juror qualifications after a verdict has been rendered, lest parties be allowed a second bite at the apple whenever the litigation does not end in their favor. 180 Md. at 104, 23 A.2d at 3 (citing *Johns,* 60 Md. at 220); *see also Johns,* 60 Md. at 223. This Court also noted the potential for collusion between defendants and venal jurors to invalidate guilty verdicts by subsequently revealing or conjuring some disqualifying trait in order to obtain a new trial. *Young v. Lynch,* 194 Md. 68, 73–74, 69 A.2d 787, 789 (1949) (citing *Hollars v. State,* 125 Md. 367, 376–77, 93 A. 970, 974 (1915)).

Because Owens waited until after *voir dire* (indeed, after a verdict was reached) to challenge Alade's presence on the jury, he waived his statutory right to challenge an unqualified juror.[47] Simply because *Boyd* did not require the citizenship question to be a mandatory one for the trial judge to pose to the venire does not excuse Owens of exercising due diligence in requesting the question. Had he done so, Owens's request most likely would have been granted and Alade would have been excused. Even if the trial judge had refused to pose the question, the issue would have been preserved for appellate review. In either instance, the result is far better than the waiver we find due to Owens's lack of foresight in at least proposing the question. Accordingly, we find no abridgement of Owens's right to a trial by jury.

---

**47.** In fact, even if Owens possessed a constitutional or common law right to a jury composed entirely of U.S. citizens, those same common law principles indicate that waiting until this stage in the proceedings constitutes a waiver of his right to challenge a non-citizen juror. *Kohl v. Lehlback,* 160 U.S. 293, 300, 16 S.Ct. 304, 306, 40 L.Ed. 432 (1895); DUNCOMBE, *supra* note 24, at 150; *see also Moton v. State,* 256 Ga.App. 594, 569 S.E.2d 264, 266–67 (2002).

### B. Suppression Challenge

 Owens invokes the self-incrimination provision of the Fifth Amendment of the U.S. Constitution, as applicable to the states by incorporation under the Fourteenth Amendment [48] and construed by the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), for the proposition that his questioning by the Howard County police detectives at the Hospital was illegal because it was custodial in nature and not preceded by the proper warnings prescribed by *Miranda.* Perhaps nothing is more recognized in the realm of constitutional criminal procedure than the notion that once a suspect is in "custody," agents of law enforcement must advise the suspect of his *Miranda* rights before engaging in "interrogation," should the state wish to admit the resulting statements against the suspect at trial. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612; *accord Fenner v. State,* 381 Md. 1, 9, 846 A.2d 1020, 1024–25. It is clear that the strictures of *Miranda* apply only in a custodial setting. *Miranda,* 384 U.S. at 441, 444, 86 S.Ct. at 1610–11, 1612; *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994) (per curiam); *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985); *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *accord Abeokuto v. State,* 391 Md. 289, 333, 893 A.2d 1018, 1043 (2006); *Fenner,* 381 Md. at 9, 846 A.2d at 1025 (2004). Thus, if Owens was not "in custody" at the time he was questioned by the detectives, the absence of *Miranda* warnings is immaterial and the Fifth Amendment presents no impediment to the admission of his inculpatory statements.

 A significant body of law has developed around the questions of what constitutes "custody" and "interrogation" for Fifth Amendment purposes. The *Miranda* Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody

---

**48.** *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964).

or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. "Custody," though typically associated with formal arrest or incarceration, *Allen v. State,* 158 Md.App. 194, 229, 857 A.2d 101, 122 (2004), *aff'd,* 387 Md. 389, 875 A.2d 724 (2005), is not always so clearly delineated a concept. The Supreme Court declared in *California v. Beheler* that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' *of the degree associated with a formal arrest."* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714) (emphasis added). In fact, a person is considered "in custody" when "a reason able person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995); *see also Yarborough v. Alvarado,* 541 U.S. 652, 662, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004); *accord Rucker,* 374 Md. at 209, 821 A.2d at 445; *Whitfield v. State,* 287 Md. 124, 141, 411 A.2d 415, 425 (1980). "Interrogation" is no longer considered solely as direct questioning by the police, a concept that prevailed when *Miranda* was newly-minted. That concept now "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980) (footnotes omitted); *accord Drury v. State,* 368 Md. 331, 335–36, 793 A.2d 567, 570 (2002).

The question of whether a suspect is "in custody" is determined objectively, to the exclusion of the subjective intent of law enforcement, in light of the totality of circumstances of the situation. *Alvarado,* 541 U.S. at 667, 124 S.Ct. at 2151; *Stansbury,* 511 U.S. at 323, 322, 114 S.Ct. at 1529; *accord Whitfield,* 287 Md. at 140, 411 A.2d at 425. Among the circumstances which should be considered in determining whether a "custodial interrogation" took place are:

when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Whitfield,* 287 Md. at 141, 411 A.2d at 425 (quoting *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979)).

The record here establishes that the first interrogation of Owens by the detectives took place in the pediatric ward's playroom where Detectives Kruhm and Shaffer encountered Owens. The playroom was a public space, apparently enclosed mostly in glass, and Owens was not detained in the room in any way. The two non-uniformed detectives were wearing side-arms, but did not draw or display threateningly their weapons. The questioning was brief, lasting only 10 to 15 minutes, and involved subjects relating to their investigation, but did not tend to imply that Owens was responsible for Kevonte's death. The encounter ended when Owens left the room. Under these circumstances, it is beyond cavil that the first interrogation was not custodial in nature. No force or compulsion kept Owens in the playroom: there were only two officers; and, there is no evidence that either of them advised Owens not to leave or positioned themselves to prevent or discourage such an attempt. In fact, the interview was terminated after less than a quarter of an hour because Owens left. Clearly, Owens was not placed under formal arrest, restrained in his freedom of movement, or made to feel that he was not at liberty to leave.

■ Though the second interrogation bears more characteristics of a custodial interrogation, those qualities are sufficiently outweighed by those indicative of a non-custodial encounter. The detectives initiated the second contact by seeking out Owens, who was now a suspect, in the Hospital parking lot and requested his car keys (whether to effect a search or restrain his movement was likely not clear to Owens). This request to talk was, however, from all indications, not a compulsory order and Owens agreed to accompany the detectives back inside. Owens also agreed to the audiotaping of the interview. Owens argues that the unoccupied patient room, with the door closed, was so unfamiliar and the questioning so accusatory that he must have been "in custody." This argument is significantly compromised by the fact that the hospital room was still a public place [49] from which he was more than capable of extricating himself in the face of hard questioning, a feat he accomplished after approximately 30 minutes when he evidently felt that the detectives were being too confrontational. Owens was not arrested that night.

Owens's reliance on *Bond v. State*, 142 Md.App. 219, 788 A.2d 705 (2002), is inapposite. *Bond* involved a situation where three police officers confronted a half-undressed suspect in his bedroom around midnight and, while blocking the only exit, accused him of being involved in a hit-and-run accident. 142 Md.App. at 223–24, 788 A.2d at 707–08. The Court of Special Appeals held that the unexpected nature of the sudden bedroom confrontation at such a late hour would have curtailed a reasonable person's ability to ask the officers to leave. *Bond*, 142 Md.App. at 233–34, 788 A.2d at 713.

---

**49.** We note that just because the hospital may not have been a familiar place for Owens, it remains a public place akin to a sidewalk or park for purposes of Fifth Amendment analysis. In fact, "[t]he consensus of American case law is that the questioning of a suspect who is confined in a hospital but who is not under arrest is not a custodial interrogation with the contemplation of *Miranda.*" *Cummings v. State*, 27 Md.App. 361, 369–70, 341 A.2d 294, 301 (1975). *A fortiori*, Owens, who was not confined to the Hospital (evidenced by the fact that he was found outside in the parking lot for the second interview), could not have been in custody solely because of the place of his interrogation.

There was no unexpected late-night home invasion in the present case. Rather, the two detectives approached Owens in the Hospital parking lot and acquired his con sent for more questioning. We are persuaded that Owens must not have felt unable to end the encounter because, unlike in *Bond,* he did just that.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY APPELLEE.**

Dissenting Opinion by BELL, C.J.

The majority holds that the empaneling, in a criminal case, of a jury, which includes a non-citizen, does not compromise the criminal defendant's right to a fair trial under either the United States or the Maryland Constitution, and, in any event, because the right is only statutory, not constitutional, by failing to inquire as to the citizenship status of the venire, the defendant waived the right to complain about the service of a non-citizen on the jury. I do not agree with either premise. On the contrary, I believe that Marcus Dannon Owens ("Owens"), the petitioner, did, and does now, have the constitutional right, federal and State, to a trial by jury composed only of citizens of the United States.[1] I am also of the view that, even

---

1. On this point, I am not persuaded by the majority's analysis. I incline to the view advanced by and forcefully advocated by the petitioner. I do not address this issue specifically, however, believing that the petitioner is entitled to reversal even if the right is only statutory. I note, however, that it is well settled that a jury consists of one's peers and that, as the Constitution required, *see* Article 24 of the Maryland Declaration of Rights, the General Assembly, by prescribing the qualifications for jury service, made clear that, for that purpose, a defendant's peers are his or her fellow citizens. Thus, while it may be true that neither Constitution explicitly states that only citizens may serve on juries, the implementing legislation, which necessarily is complementary and explanatory, does. Bear in mind that the legislature may not legislate in derogation of the Constitution. *See Lamone v. Capozzi,* 396 Md. 53, 73, 912 A.2d 674, 685 (2006), *citing Bienkowski v. Brooks,* 386 Md. 516, 546, 873 A.2d 1122, 1140; *Washabaugh v. Washabaugh,* 285 Md. 393, 411, 404 A.2d 1027, 1037 (1979).

 Although it was dismissed summarily as having no application to this case, 399 Md. 388, 442–43, 924 A.2d 1072, 1081–82 (2007), I believe Article 21 of the Maryland Declaration of Rights to be quite relevant

and, indeed, that its application is dispositive with respect to the composition of an "impartial jury," as consisting only of citizens. In this view, I am persuaded by *Perkins v. Smith*, 370 F.Supp. 134 (D.Md.1974). In that case, a non-citizen challenged [his/her] exclusion from jury service. In rejecting that challenge, the court enunciated principles that are just as, if not particularly, applicable to this case. The *Perkins* Court stated:

"This Court considers that grand and petit jurors in both state and federal courts are 'persons holding ... important nonelective ... judicial positions', that they participate directly in the execution of the laws and 'perform functions that go to the heart of representative government.' Blackstone [3 Blackstone Commentaries, Sec. 380] considered juries as 'the best investigators of truth, and the surest guardians of public justice.' The institution of jury trial, he said, 'preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens.' In No. 83 of The Federalist [at 562 (J. Cooke Ed.1961) (Hamilton)], Alexander Hamilton, after referring to the 'high estimation' in which he held the institution of jury trial, concluded that 'it would be altogether superfluous to examine to what extent it deserves to be esteemed useful or essential in a representative republic, or how much more merit it may be entitled to as a defense against the oppressions of an hereditary monarch, than as a barrier to the tyranny of popular magistrates in a popular government. Discussions of this kind would be more curious than beneficial, as all are satisfied of the utility of the institution, and of its friendly aspect to liberty.'

370 F.Supp. at 137. The Court went on to state:

"In maintaining the jury system as 'the very palladium of free government' the states logically can anticipate that native-born citizens would be conversant with the social and political institutions of our society, the customs of the locality, the nuances of local tradition and language. Likewise naturalized citizens, who have passed through the citizenship classes sponsored by the Immigration and Naturalization Service, have demonstrated a basic understanding of our form of government, history and traditions. There is no corresponding basis for assuming that resident aliens, who owe allegiance not to any state or to the federal government, but are subjects of a foreign power, have so assimilated our societal and political mores that an equal reliance could be placed on their performing as well as citizens the duties of jurors in our judicial system.

"The nature or the operation of juries makes it apparent that persons unfit for jury service can work a great deal of harm, through inability or malice, to efficiency and fairness. Jury deliberations are perhaps the most secret form of decision-making in the nation; the means of persuasion used by jurors on each other are never revealed. A single juror who failed to understand the import of the evidence being presented or who lacked any concern for the fairness of the outcome could severely obstruct or distort the course of justice. A single persuasive and unprincipled juror could even direct the course of justice into channels deliberately chosen for their deleterious effect

if the right to an all citizen jury is only statutory, Owens did not waive the right. To save this conviction, the majority holding, in that regard, imposes on criminal defendants a burden that is both unnecessary and unreasonable and, for good measure, misapplies our precedents. Therefore, I dissent.

## I.

Whatever may be the case with respect to the constitutional right to jury trial, it is quite clear that Mr. Alade, a noncitizen, did not meet Maryland's statutory requirements for juror qualification. Maryland Code (1973, Repl.Vol.2002) § 8–207(b) of the Courts and Judicial Proceedings Article ("CJP") provides that, in order to serve on a jury, one must be, *inter alia*, an adult citizen of this State. As pertinent, it provides:

"(b) Grounds for disqualifications.—A person is qualified to serve as a juror unless he:

"(1) Is not constitutionally qualified to vote in the county where the court convenes;

---

on this country. We conclude, therefore, that the state has a compelling interest in the restriction of jury service to those who will be loyal to, interested in, and familiar with, the customs of this country." *Id.* at 138. The court recognized, quite correctly, that "service on juries is the prime example of an instance 'where citizenship bears some rational relationship to the special demands of the particular position.'" *Id., quoting Dougall v. Sugarman,* 339 F.Supp. 906, 911 (D.C.N.Y.1971) (Lumbard, J. concurring); *see Carter v. Jury Commission,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *Jugiro v. Brush,* 140 U.S. 291, 11 S.Ct. 770, 35 L.Ed. 510 (1891); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879) (recognizing the special relationship between citizenship and jury service).

Because I believe the right to an impartial jury requires the jury to consist of citizens and that right is constitutionally given, the standard for waiver is significantly different, it must be done "knowingly and voluntarily," a proposition with which the majority does not disagree. 399 Md. at 404–05, 418–19 n.41, 924 A.2d at 1081, 1089–90 n.41. In this case, the record is clear, Owens was not aware that Mr. Alade was not a citizen until after his trial and, thus, he could not have waived his right to an impartial jury trial knowingly and voluntarily.

**434**

"(8) Is under 18 years of age[.] [2]

Section 8–207 also provides for limited instances of disqualification,[3] specifically, where there is a language problem, an

---

2. It is perfectly clear that former Maryland Code (1973, Repl.Vol.2002) § 8–207(b) of the Courts and Judicial Proceedings Article required a prospective juror to be a citizen of the United States, for in order to vote in any county of this State, one must be, pursuant to Maryland Code (2003) § 3–102(a)(1) of the Election Law Article, a United States citizen. The current iteration of § 8–207(b), codified at Maryland Code (1973, Repl.Vol.2006) § 8–103(a) of the Courts and Judicial Proceedings Article, is even clearer, using express language to that effect:
 "(a) *Requirements.*—Notwithstanding § 8–102 of this subtitle, an individual qualifies for jury service for a county only if the individual:
 "(1) Is an adult as of the day selected as a prospective juror;
 "(2) *Is a citizen of the United States;* and
 "(3) Resides in the county as of the day sworn as a juror."
 (Emphasis added).

3. See CJP § 8–207(b), which provided:
 "(b) *Grounds for disqualification.*—A person is qualified to serve as a juror unless he:
 "(1) Is not constitutionally qualified to vote in the county where the court convenes;
 "(2) Is unable to read, write, or understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
 "(3) Is unable to speak the English language or comprehend spoken English;
 "(4) Is incapable, by reason of physical or mental infirmity, of rendering satisfactory jury service; any person claiming such a disqualification may be required to submit a doctor's certificate as to the nature of the infirmity;
 "(5) Has a charge pending against him for a crime punishable by a fine of more than $500, or by imprisonment for more than six months, or both, or has been convicted of such a crime and has received a sentence of a fine of more than $500, or of imprisonment for more than six months, or both, and has not been pardoned;
 "(6) Has a charge pending against him for, or has been convicted of, an offense punishable under the provision of § 8–401(c) of this title."
 "(7) Is a party in a civil suit, except for those civil actions in which a party is not entitled to a jury trial, pending in the court in which he is called to serve;
 "(8) Is under the age of 18 years of age;
 "(9) Fails to meet any other objective test prescribed by the Court of Appeals.

inability to speak, understand and/or write the English language, a documented disability which prevents satisfactory jury service and there is a disqualifying or pending disqualifying conviction.

Owens did not learn that one of the jurors who sat on his case, Mr. Alade, was a non-citizen until after he had been convicted. Indeed, if Mr. Alade had not informed the jury commissioner to the contrary,[4] his citizenship status never would have become an issue; it undoubtedly would have remained undiscovered and, thus, unknown. That is not at all surprising, or should be: the majority points out that "[the jury commissioner's office] does not review for accuracy the responses provided by juror candidates unless some information is missing," 399 Md. 388, 400–01, 924 A.2d 1072, 1079 (2007), and, presumably because he had filled out the juror qualification form adequately, that office clearly did not verify Mr. Alade's citizenship in this case. As it was required to do, pursuant to Maryland Code (2001) § 6–105 of the Criminal

---

This section now is codified at CPJ § 8–103(b), *see* Acts of 2006, ch. 372, and provides:

"Disqualifying factors

"(b) Notwithstanding subsection (a) of this section and subject to the federal Americans with Disabilities Act, an individual is not qualified for jury service if the individual:

"(1) Cannot comprehend spoken English or speak English;

"(2) Cannot comprehend written English, read English, or write English proficiently enough to complete a juror qualification form satisfactorily;

"(3) Has a disability that, as documented by a health care provider's certification, prevents the individual from providing satisfactory jury service;

"(4) Has been convicted, in a federal or State court of record, of a crime punishable by imprisonment exceeding 6 months and received a sentence of imprisonment for more than 6 months; or

"(5) Has a charge pending, in a federal or State court of record, for a crime punishable by imprisonment exceeding 6 months."

4. Perhaps it is because Mr. Alade, on his own, advised the jury commissioner of his alien status that Mr. Alade's assertion that he did not intentionally misrepresent his status is not being challenged. What is troubling, of course, is the lack of verification or follow-up by the jury commissioner's office.

Procedure Article,[5] the Circuit Court held a hearing to determine whether the non-disclosure, and/or the juror's status, influenced the outcome of the trial, thus, entitling Owens to a new trial. The court found that neither denied Owens a fair trial. It, therefore, rejected Owens' constitutional and statutory arguments. The court viewed Mr. Alade's non-disclosure and consequent service on the jury to be purely a statutory matter, cognizable on *voir dire*. Because Owens did not pose a question, during *voir dire*, inquiring into the citizenship status of the venire, to include Mr. Alade, the court concluded that he had waived his objection to Mr. Alade's service on the jury, notwithstanding his non-citizenship and the fact that, had that fact been known, he would have been required to have been struck for cause. The Court of Special Appeals affirmed. Like the trial court, it believed that *voir dire*, rather than post-judgment, was the proper time for Owens to have challenged unqualified jurors, and that his failure to inquire of the panel as to the citizenship of its members at that time is equivalent to a waiver of the challenge. *Owens v. State*, 170 Md.App. 35, 71–73, 906 A.2d 989, 1009–10 (2006). The majority concurs in that rationale. 399 Md. at 419–20, 924 A.2d at 1090.

## II.

How the majority reaches the result it does is quite interesting and also most instructive. It acknowledges the three levels of screening that this Court has recognized potential jurors are subjected to ensure that they are minimally qualified to serve and, further, that each level of screening is performed by a different actor. 399 Md. at 418–20, 924 A.2d

---

**5.** Maryland Code (2001) § 6–105 of the Criminal Procedure Article provides, as relevant:

"(a) *Timing of hearing on motion.*—Except as provided in subsection (b) of this section, a court in which a motion for new trial in a criminal case is pending *shall* hear the motion:

"(1)within 10 days after the motion is filed; or

"(2) if an agreed statement of the evidence or a statement of the evidence certified by the trial judge is filed, within 10 days after the statement is filed."

at 1089–90, *citing* and *quoting Boyd v. State*, 341 Md. 431, 441, 671 A.2d 33, 38 (1996).[6] Viewing those efforts as not much more than preliminary, certainly not conclusive, with respect to juror qualifications, the majority perceives the *voir dire* procedure, which it characterizes as "a proper procedural screening occasion to verify juror qualifications," as the fall back position, "[i]n the event that the court's internally-administered means of automatically disqualifying prospective jurors has failed to eliminate a disqualified juror." *Id.* at 419, 924 A.2d at 1090. For that proposition, it relies on *Williams v. State*, 394 Md. 98, 112, 904 A.2d 534, 542 (2006); *Jenkins v. State*, 375 Md. 284, 331, 825 A.2d 1008, 1035 (2003) and *Dingle v. State*, 361 Md. 1, 9, 759 A.2d 819, 823 (2000), in turn *citing Boyd*, 341 Md. at 435, 671 A.2d at 35, *Grogg v. State*, 231 Md. 530, 532, 191 A.2d 435, 436 (1963), *Hill v. State*, 339 Md. 275, 280, 661 A.2d 1164, 1166 (1995), and *Bedford v. State*, 317 Md. 659, 670, 566 A.2d 111, 116 (1989). It is from this premise that the majority asserts "a defendant's failure to pursue the opportunity to question prospective jurors as to citizenship during *voir dire* constitutes a waiver of the statutory means of

---

**6.** The first level occurs when the juror qualification form is executed and returned and it is under the supervision of the jury commissioner's office, overseen by the jury judge. The second level occurs when the potential juror comes to court; he or she then is seen by, and may be interviewed by, the jury commissioner or the jury judge. At this stage, "upon the juror's appearance at the court," as *Boyd v. State*, 341 Md. 431, 444, 671 A.2d 33, 39 (1996), makes clear, "the jury judge or commissioner [is authorized] to question the potential juror further on the information contained in the questionnaire." The third level occurs in the courtroom during jury selection, when, in the superintendence of the process, the trial judge has the opportunity to observe the venire. The main purpose of the juror qualification questionnaire is the formation of a jury pool. Necessarily, therefore, the object of the inquiry largely relates to whether, at the threshold, the potential juror meets the minimum qualifications of a juror. It is still at issue, although, perhaps not so much as at the questionnaire stage, at the second screening, where deferrals or excuses from service take on a greater importance. As we shall see, *infra*, the jury pool having been set and two screenings having already occurred, the focus at the third screening is on empaneling a fair and impartial jury, not determining whether the venire is properly constituted. At that stage, it is assumed to be, and reasonably so.

protecting the right to a citizen jury." *Id.* at 419–20, 924 A.2d at 1090.

The implications of the pre-screening process—that it is monitored by the jury commissioner's office, an arm of the court, that a question on the juror qualification questionnaire specifically asked the citizenship question and that it was in this case answered albeit, and perhaps inadvertently, incorrectly—and the fact that *voir dire* inquiries into juror qualifications are not mandatory questions, *see Boyd,* 341 Md. at 446–47, 671 A.2d at 40–41, are not lost on the majority. Its response to the former is facile and predictable: " '[w]hile [Owens] may have assumed that the venire panel had been pre-screened based on the jury questionnaire, it is easy to anticipate that mistakes do occur, which is why a questionnaire alone is not the sole tool used to select a jury.' " *Id.* at 419, 924 A.2d at 1090, *quoting Owens v. State,* 170 Md.App. at 73, 906 A.2d at 1010. It buttresses its logic by citing a case, decided 113 years before *Boyd* and whose rationale is inconsistent with Boyd's holding and rationale. *Johns v. Hodges,* 60 Md. 215, 221–22 (1883) [7]

As to the latter, the majority confesses partial error, and, thus, overrules that portion of *Boyd* that made *voir dire* questions concerning minimum statutory qualifications for jurors discretionary, rather than mandatory. It pronounces

---

7. In *Johns v. Hodges,* 60 Md. 215, 221–22 (1883), our predecessors reasoned:

"The right of challenge itself is a safeguard provided by law in contemplation of the contingency that the officers whose duty it is to select only qualified persons have failed in the performance of that duty. It is a means specially provided by which a party to a suit may readily and effectually protect him self against any oversight or neglect committed in the original selection."

That reasoning is the exact opposite of that employed by this Court in *Boyd.* Rather than applaud an inquiry aimed at checking the adequacy with which the jury commissioner or comparable official performed, we decried and discouraged the "redundancy." 341 Md. at 438, 671 A.2d at 37 (indicating that the inquiry in that case, involving physical infirmity, one of the enumerated minimum qualifications, was "to be conducted at several earlier points in the juror selection process, rendering the requested questions unnecessary on *voir dire.*").

itself satisfied "that it is in the better interests of justice to require trial judges to pose *voir dire* questions directed at exposing constitutional and statutory disqualifications when requested by a party." 399 Md. at 422, 924 A.2d at 1092. Its explanation for why that is necessary is classic bootstrapping:

> "The rule in *Boyd* that *voir dire* questions concerning minimum statutory qualifications are not mandatory when sought was animated, in part, by a belief that such questions duplicate needlessly the efforts of the pre-*voir dire* screening methods which focus on statutory disqualifications. That cases such as the present one occur demonstrate a correctable weakness in this reasoning. Because the pre-*voir dire* screening methods failed to identify and excuse Alade, a non-citizen, it is evident that *voir dire* questions regarding minimum statutory qualifications are not always 'redundant and unnecessary.' In fact, our cases ruminate that the pre-*voir dire* processes of screening out disqualified jurors are not fail-safe. . . ."

*Id.* at 422, 924 A.2d at 1091–92 (footnote and citation omitted). In support of the latter proposition, the majority again turns to *Johns v. Hodge.* And it directs our attention to the concession by the jury commissioner for Howard County, "that his staff did not confirm the veracity of the information contained on juror questionnaires and the orientation session also failed to address citizenship as a qualification." *Id.* at 419–20 n. 42, 924 A.2d at 1090 n. 42.

The partial overruling of *Boyd* is prospective, of course, and does not, therefore, serve to make the question in this case mandatory. Nevertheless, presumably because, in the majority's view, the defendant could, and probably should, have anticipated that there could be a failure of the screening process, thus allowing a non-citizen to slip through the cracks, the majority faults Owens for relying on the screening procedures and not asking the court to again ask the venire a question to which everyone of them already had responded, and consistently so with service on the jury. To it, because the trial court's refusal to ask the question could have been

reviewed for an abuse of discretion, Owens may only benefit from the jury deficiency if he asked the trial court to inquire of the venire concerning an issue as to which he had no basis for inquiring.[8]

At the outset, the *voir dire* process is not a back-up to the juror qualification process; its office is not to "verify juror qualifications." None of the cases cited for this proposition support it. To be sure, in *Williams*, 394 Md. at 112, 904 A.2d at 542, we said that "[V]oir dire is the mechanism by which we give substance to the constitutional guarantee to criminal defendants of a fair and impartial jury trial," which, we made clear, was accomplished by "exclud[ing] from the venire potential jurors for whom there exists cause for disqualification, so the jury that remains is capable of deciding the matter before it based solely on the facts presented, and uninfluenced by extraneous considerations." *Id.* at 107, 904 A.2d at 539, *citing*

---

8. Self-servingly, the trial court indicated that, had Owens proposed a "citizenship" question, the court would in all likelihood have asked it, and Mr. Alade would have been excused. The majority accepts that speculation. That is all that is, speculation. And speculation is much too tenuous support for the denial of so important a right. There is, moreover, not even a guarantee that Mr. Alade would have responded to the question. After all, he had once, already, inadvertently failed to respond correctly to a rather straight-forward and unambiguous question.

It is curious that the majority believes that the respondent would have been helped by proposing the citizenship question to be put to the venire. That presupposes that the information now known either should have been known then or would become known during the *voir dire* process. Otherwise, because the exercise of discretion is judged on the basis of information known, and the facts and circumstances existing, when the discretion is exercised, the later discovery of the lack of citizenship on the part of Mr. Alade would not inform the decision on review. As the majority has correctly pointed out, that a juror provides false information does not guarantee relief. *See* 399 Md. at 423–24, 924 A.2d at 1092–93, *citing Hunt v. State*, 345 Md. 122, 144–46, 691 A.2d 1255, 1265–66 (1997); *Leach v. State*, 47 Md.App. 611, 618–19, 425 A.2d 234, 238–39 (1981) (affirming the refusal to strike a juror, who upon cross-examination at trial, was discovered to be an old neighbor and acquaintance of a State's witness when the trial judge was satisfied that the juror had no bias and *Burkett v. State*, 21 Md.App. 438, 445, 319 A.2d 845, 849 (1974)(failure to reveal relationship to prosecutor)). The interest of justice could and probably would suffice as a basis for

*Hill,* 339 Md. at 279, 661 A.2d at 1166, in which we stated that the *voir dire* procedure is undergirded by the "single, primary, and overriding principle or purpose: 'to ascertain "the existence of cause for disqualification." ' " *Quoting McGee v. State,* 219 Md. 53, 58, 146 A.2d 194, 196 (1959), in turn *quoting Adams v. State,* 200 Md. 133, 140, 88 A.2d 556, 559 (1952). *See Jenkins,* 375 Md. at 331, 825 A.2d at 1035–36 ("[O]ne of the ways to protect a defendant's constitutional right to an impartial jury is to expose the existence of factors which could cause a juror to be biased or prejudiced through the process of *voir dire* examination"); *Dingle,* 361 Md. at 9, 759 A.2d at 823 (stating that *voir dire* is the process by which prospective jurors are examined to determine whether cause for disqualification exists); *Boyd,* 341 Md. at 435, 671 A.2d at 35 (same).

In *Boyd,* we explained the nature of the disqualification to which we had reference:

"In virtually all our previous cases ..., the proposed questions concerning specific cause for disqualification were related to the biases, such as racial or religious interests or prejudices, of the prospective jurors. As a result, in discussing what type of questions *must* be asked on *voir dire,* we have defined the proper focus of the *voir dire* examination to be only "the venireperson's state of mind and the existence of bias, prejudice, or preconception, *i.e.,* 'a mental state that gives rise to cause for disqualification....' " *Hill,* 339 Md. at 280, 661 A.2d at 1167, *citing Davis[ v. State],* 333 Md. [27,] 37, 633 A.2d [867,] 872 [ (1993) ]. Although we did make a general statement in *Davis* that the minimum statutory qualifications for jurors would be included in the mandatory scope of *voir dire,* that case pertained solely to possible biases the venirepersons might have had in favor of law enforcement personnel, and our analysis and application of the rules of *voir dire* involved primarily the search for bias."

341 Md. at 436–37, 671 A.2d at 36. Thus, *Boyd* and all of the cases the majority cites, with the exception of the over-broad statement in *Davis v. State,* addressed a process developed to ensure juror impartiality, not to verify juror qualification.

relief, I would have thought, but it is an avenue available in this case already.

This is consistent with the elaborate system for vetting potential jurors that the Court identified and described in Part IV of the *Boyd* decision. 341 Md. at 441–45, 671 A.2d at 38–40. That system, whose origin is a statutory scheme of some sophistication, is implemented by Rules of this Court in which this Court plays a significant role. The Rule requires each circuit court to develop a jury plan, which must be approved by the Court of Appeals. The plan prescribes the procedures for compiling a list of potential jurors meeting the minimum statutory qualifications and for processing them. It assigns responsibility for the superintendence of the process to court personnel, including the bench or jury judge, and it contemplates that such personnel will gather the necessary information and do what is required to amass a venire, to develop a pool from which impartial juries may be selected. That system, I submit, contemplates that the litigants will rely on the results of the process. It simply is inconceivable that the majority's view of the jury plans and the very important tasks assigned to court personnel in order to develop a venire is correct. That certainly is not how this Court viewed such systems in *Boyd.*

There, we construed the jury selection subtitle as being "concerned with the *removal* of unnecessary screening barriers," so that mandatory *voir dire* of prospective jurors about matters (in that case, their physical limitations) already thoroughly covered earlier in the selection process "*imposes* an unnecessary screening barrier. Indeed, further questioning may embarrass or intrude upon the privacy of a prospective juror." *Boyd,* 341 Md. at 446, 671 A.2d at 40 (emphasis in original). That is especially the case, we added, "when an affirmative answer does not by any means denote likely disqualification[.]" *Id.* We also said:

> "The petitioners cannot specify a single reason why further questioning specifically on physical limitations is necessary. We acknowledge that a question on *voir dire* about physical limitations of jurors and addressed to all venirepersons might occasionally result in disqualification of a juror; but so might literally any other line of questioning. Defendants

have not documented instances where the juror selection process failed completely to screen out physically incapable jurors, who would have been identified and excused had the question been asked on *voir dire*. In short, unless the judge has made some observations regarding possible physical problems, such questioning can become merely a general attempt to 'fish' about for more information than is necessary about prospective jurors. Certainly it is not reasonably likely to lead to cause for disqualification."

*Id.*, 671 A.2d at 40–41. These observations apply with at least equal force to the case *sub judice*, with the exception of the likelihood of disqualification. Owens had no reason to suspect that Mr. Alade was not a citizen and neither did anyone else. The trial judge, so far as the record reflects, had not made any observations concerning possible citizenship problems and certainly the pre-screening process had revealed none.[9] Under these circumstances, there was no basis to ask the question, the screening already having been done, and there simply is no basis for believing that had it been proposed, it would have been met with anything but a refusal, in the absence of the proffer of some basis for doing so.

There is also in this case no showing of "documented instances" where the juror selection process has failed completely to screen out nor-citizens, just this case. That is not enough, I submit, not by a long shot. Nothing is perfect. There simply is no completely fail-safe system, no matter what it is intended to accomplish. Because this is so, one always can anticipate and expect mistakes. But this fact does not mean that the system is broken. It is not a reason to deny to a party the right to rely on the results of the process or to change the responsibility for inquiring, in hopes of discovering

---

9. That the jury commission office did not verify Mr. Alade's citizenship or challenge his assertion that he was a citizen is not a basis for suggesting that Owens should have known to inquire. Just the opposite, the responsibility for developing the jury pool, which necessarily requires the screening of the potential jurors for eligibility, is placed on the jury commission office, not the defendant. This opinion shifts that responsibility and it does so unreasonably and unnecessarily.

the pertinent information. It is not a basis for holding a party to a different standard or changing the jurisprudence.

Maryland is, and has prided itself on being, a limited *voir dire* State. *See Curtin v. State*, 393 Md. 593, 602, 903 A.2d 922, 928 (2006); *Landon v. Zorn*, 389 Md. 206, 216, 884 A.2d 142, 147 (2005); *State v. Thomas*, 369 Md. 202, 215–17, 798 A.2d 566, 574–75 (2002); *Davis*, 333 Md. at 34, 40–43, 633 A.2d at 870, 873–75. There are, at present, only a few mandatory inquiries. *Dingle*, 361 Md. at 11 n. 8, 759 A.2d at 824 n. 8, listed those this Court has identified: "racial, ethnic and cultural bias," *Hernandez v. State*, 357 Md. 204, 232, 742 A.2d 952, 967 (1999); *Hill*, 339 Md. at 285, 661 A.2d at 1169; *Bowie v. State*, 324 Md. 1, 15, 595 A.2d 448, 455 (1991), religious bias, *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 606–07, 143 A.2d 627, 632 (1958), predisposition as to the use of circumstantial evidence in capital cases, *Corens v. State*, 185 Md. 561, 564, 45 A.2d 340, 343–44 (1946), and placement of undue weight on police officer credibility, *see Langley v. State*, 281 Md. 337, 349, 378 A.2d 1338, 1344 (1977). To these, we may add the inquiries approved in *Thomas*, 369 Md. at 214, 798 A.2d at 573 (bias due to the nature of the narcotics crime with which the defendant is charged) and *Sweet v. State*, 371 Md. 1, 9–10, 806 A.2d 265, 271 (2002) (applying *Thomas* to sexual abuse related crimes). All of these categories involve "potential biases or predispositions that prospective jurors may hold which, if present, would hinder their ability to objectively resolve the matter before them." *Davis*, 333 Md. at 36, 633 A.2d at 872. Ironically, this case expands those categories to each and every qualification category there is. Questions proposed as to any of them, whether there is basis for them or not, will have to be asked; there simply is no basis for doing otherwise. The jury commissioner is just as likely to make mistakes as to any one of them as he or she has done with regard to citizenship. Moreover, an attorney representing a defendant will be constrained to ask each of the questions for fear of later post-conviction—the failure to ask and there subsequently turns up information showing a juror was disqualified for failing to meet one of them would be incompe-

tency of counsel, as the defendant's right to appeal would have been lost. This hardly seems to be productive of judicial economy. Just the opposite.

Judge CATHELL joins in the views herein expressed.